This appeal presents once again an issue that has been described as "[t]he single most important unresolved issue concerning underinsured motorist coverage"[1] — the right of an insured to settle with a tort-feasor, and to give the tort-feasor a complete release without getting the consent of the insured's carrier of underinsured motorist coverage to the settlement. This appeal is from a summary judgment in which the trial court held, as a matter of law, that an underinsured motorist insurance carrier, which had refused to consent to a settlement between its insured with the tort-feasor, was not liable to pay its insured any benefits.
The facts are essentially undisputed. On October 18, 1985, Shelby Lambert and her son, Ryan Lambert, were injured in an automobile accident as a result of the alleged negligence of Ms. Kitty Hall. Ms. Hall's liability insurer, Alfa Mutual Insurance Company, settled Ryan Lambert's claims shortly thereafter upon payment of the sum of $350. *Page 162 
During the next several months, Ms. Lambert was unable to reach a settlement agreement with Alfa, apparently because Ms. Lambert believed her damages to be greater than the amount of Alfa's original offer of $7,500. In any event, in 1987, Shelby and Robert Lambert sued Ms. Hall in the Montgomery Circuit Court, claiming damages of $250,000; Robert Lambert claimed damages for loss of consortium. Ms. Hall sought a change of venue and the case was removed to the Elmore Circuit Court.
While this initial suit remained pending in the Elmore Circuit Court, the Lamberts filed a similar suit in the Montgomery Circuit Court on January 5, 1989, naming as defendants their own underinsured motorist insurance carrier, State Farm Mutual Insurance Company, and Ms. Hall. In this complaint, the Lamberts alleged that they were insureds under two separate underinsured motorist policies issued by State Farm and that the policy provisions that required them to obtain State Farm's consent before they could settle with the tort-feasor were unconscionable, violative of public policy, and void.
In April 1989, Alfa, Ms. Hall's liability insurer, offered the Lamberts $25,000, the maximum amount of coverage under Ms. Hall's liability policy. The Lamberts informed State Farm of this offer, but State Farm refused to give its consent to a settlement for this sum and informed the Lamberts that if they accepted Alfa's settlement offer without first obtaining State Farm's written consent, as required by their policy, State Farm would refuse to pay any underinsured motorist benefits. Nonetheless, on September 18, 1989, one month before the trial date of the Lambert's suit against Ms. Hall in the Elmore Circuit Court, the Lamberts agreed to accept Alfa's offer of $25,000 and to release Ms. Hall and Alfa from further liability, and they so notified State Farm. The next day, State Farm offered the Lamberts $25,000 in an attempt to protect its subrogation rights. However, the Lamberts refused State Farm's offer, basing their refusal to accept on the ground that they had already agreed to dismiss their action against Ms. Hall. The Lamberts accepted Alfa's settlement offer and executed a release.
Thereafter, State Farm filed its motion for summary judgment in the suit filed against it, and as grounds for the motion stressed that the Lamberts had breached their contract with State Farm by releasing Ms. Hall and Alfa without first obtaining its written consent as required by the policy. The trial court agreed, entered summary judgment for State Farm, and made the judgment final pursuant to the provisions of Rule 54(b), Ala.R.Civ.P. The Lamberts appeal.
Although the only issue presented is whether the trial court properly entered the summary judgment for State Farm, the Lamberts ask us to hold that "consent to settle" clauses in uninsured/underinsured motorist policies are void as against public policy.[2]
The enforceability of "consent to settle" and "subrogation" clauses in uninsured/underinsured motorist policies is a troublesome issue, and the issue has been considered by this Court and the Court of Civil Appeals on other occasions, but neither this Court nor the Court of Civil Appeals has specifically held, in a situation involvingunderinsured motorist coverage, that a consent-to-settle clause or a subrogation clause is void, and neither Court has set outspecific procedures that should be followed when a dispute develops between an insured and his or her provider of underinsured motorist coverage. In this case, we will attempt to set forth some specific guidelines that should be of assistance to the disputants and the courts when such problems arise.
To establish these procedures, we begin by reviewing the history of uninsured/underinsured *Page 163 
motorist coverage in Alabama. The legislature in 1966 adopted Alabama's first Uninsured Motorist Act. See Act No. 866, Acts of Alabama 1965, Regular Session, Vol. II, p. 1614, amended by Act No. 84-301, Acts of Alabama 1984, p. 672; many of the provisions of those acts have now been codified in Ala. Code 1975, § 32-7-23.
From the beginning, disputes have surfaced between insurers and their insureds over the extent to which insurers can exclude coverage in view of the mandates of the legislature contained in the Uninsured Motorist Act, as amended. Some of the first cases involved the right of an insurer to prevent "stacking" of coverage, for example. See Travelers Ins. Co. v.Jones, 529 So.2d 234 (Ala. 1988) (even though the passengers were not named insureds, they could stack coverage because they came within the definition of "insured" under the terms of the uninsured motorist portion of the policy and there was additional coverage for another automobile within the contract); White v. Georgia Cas. and Sur. Ins. Co.,520 So.2d 140 (Ala. 1987) (a company employee, designated in the primary liability section of the insurance policy as one who is "insured thereunder," was allowed to stack coverage under the company's fleet policy; the passenger was held not to be "insured thereunder" and was not allowed to stack coverage); and Safeco Ins. Co. of America v. Jones, 286 Ala. 606,243 So.2d 736 (1970). Other cases have raised different issues. See, e.g., Sweatt v. Great American Ins. Co., 574 So.2d 732
(Ala. 1990) (the provisions of the uninsured motorist statute do not apply to excess insurance policies); Best v. Auto-OwnersIns. Co., 540 So.2d 1381 (Ala. 1989) (a person who voluntarily elects not to obtain underinsured motorist coverage in a state that does not mandate such coverage is not protected by underinsured coverage when involved in an accident in Alabama merely because Alabama mandates uninsured coverage unless rejected by the policy owner).
The purpose of the Uninsured Motorist Act has been stated many times and was summarized in Champion Ins. Co. v. Denney,555 So.2d 137 (Ala. 1989), as follows:
 "It appears from the plain and unambiguous wording of [Ala. Code 1975, § 32-7-23] that it is the purpose of the Uninsured Motorist Act, and, thus, the public policy of the state, that Alabama citizens purchasing automobile liability insurance are to be able to obtain, for an additional premium, the same protection against injury or death at the hands of an uninsured motorist as they would have had if the uninsured motorist had obtained the minimum liability coverage required by the Motor Vehicle Safety Responsibility Act."
Apparently, the first attack on the validity of consent-to-settle and subrogation clauses was made inAlabama Farm Bureau Mut. Cas. Ins. Co. v. Clem, 49 Ala. App. 457, 273 So.2d 218 (Ala.Civ.App. 1973). In that case, the insured "settled with the insurer of one possible tort-feasor for $10,000.00, and later recovered a $39,300.00 judgment from the uninsured tort-feasor, leaving unrecovered damages of $29,300.00." 49 Ala. App. at 461, 273 So.2d at 221. The insurer in that case argued on appeal that its insured had not first obtained its written consent to settle with the tortfeasor, that it had the right to limit its liability in this manner, and that the policy provision did not contravene public policy. The Court of Civil Appeals, in affirming the judgment of the trial court holding that the exclusionary clause did not prevent a settlement under the facts of that case, stated, "This exclusion, when applied to tort-feasors other than theuninsured motorist, is an invalid abridgment of the coverage required by the statute, and is void." 49 Ala. App. at 461,273 So.2d at 222 (quoting with approval Harthcock v. State FarmMut. Auto. Ins. Co., 248 So.2d 456, 459 (Miss. 1971)). (Emphasis added.)
The Court of Civil Appeals reached a similar result inAlabama Farm Bureau Mut. Cas. Ins. Co. v. Humphrey, 54 Ala. App. 343, 308 So.2d 255 (Ala. Civ. 2 App. 1975). There, plaintiff's intestate, the defendant's insured, was killed in an automobile accident involving three vehicles. The insured was riding in an uninsured automobile. One of the other automobiles was also *Page 164 
uninsured, but the third vehicle was insured. The personal representative of the insured entered into a pro tanto settlement with the insured tort-feasor without first obtaining the consent of the intestate's insurer and without protecting the insurer's subrogation rights. The court held, as it had inClem, "that the Alabama uninsured motorist statute contain[s] no provision as to rights of subrogation, as do the statutes in some other states," but that the principle of law enunciated by this Court in Safeco Ins. Co. of America v. Jones, 286 Ala. 606, 243 So.2d 736 (1970), would not permit an insurer "to insert any provision in its policy limiting such recovery by the insured." 54 Ala. App. at 346, 308 So.2d at 257.
Clem and Humphrey both involved pro tanto settlements by the insured with tort-feasors who were insured, and although the Court of Civil Appeals, in Humphrey, held that the uninsured motorist statute was to be construed so as to assure an injured insured full recovery from whatever source was available, the court also wrote, "we do not decide whether a subrogation provision is applicable to a claim against the uninsuredmotorist. We adhere to our decision in Clem, supra."54 Ala. App. at 347, 308 So.2d at 258. (Emphasis added.) The issue not decided in Humphrey, of course, is the one presented here: whether a provider of underinsured motorist coverage can protect its right to be subrogated against an underinsured tort-feasor when its insured wants to settle with the tort-feasor and give the tort-feasor a complete release, and, if it can, what procedures it must follow in order to do so.
In 1984, the legislature amended the Uninsured Motorist Act, mandating underinsured motorist coverage in automobile liability policies unless rejected by the insured. Ala. Code 1975, § 32-7-23. Even though Clem and Humphrey had both discussed the fact that the legislature had not made any provision regarding the subrogation rights of insurers, the legislature, nevertheless, neither mandated nor prohibited the right of an insurer to include a consent-to-settle clause in its policy, even though both Clem and Humphrey had been decided prior to the time the legislature amended the Code provisions relating to uninsured motorist coverage in policies of automobile liability insurance.
Courts in a number of states have recognized that the purpose of consent-to-settle clauses in the uninsured/underinsured motorist insurance context is to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between the insured and the tort-feasor at the carrier's expense. See Note,Underinsured Motorist Coverage: The Validity of Consent toSettle Clauses, 37 Drake L.Rev. 503 (1987-1988).
This Court has not squarely held that consent-to-settle clauses are invalid as violative of the public policy of this state as set forth in the Uninsured Motorist Act. This Court has, of course, addressed the enforceability of such clauses in several cases, involving differing factual settings. One of the first cases involving such a clause was United ServicesAutomobile Association v. Allen, 519 So.2d 506 (Ala. 1988). In that case, the insured sought an injunction to prevent his underinsured motorist insurance carrier from withholding consent to his settlement with the underinsured tort-feasor's insurer. Although the trial court granted the injunction, and this Court affirmed, there is nothing in this Court's opinion that holds that a consent-to-settle clause is invalid. This Court found only that "there [was] nothing in the record . . . to show that USAA had a reasonable basis for withholding [its] consent." Id. at 508. This Court did hold, of course, that the refusal of an underinsured motorist insurance carrier to consent to settle must be reasonable, and that the refusal was not reasonable in that case.
In Hardy v. Progressive Ins. Co., 531 So.2d 885 (Ala. 1988), the insured released the tort-feasor without her underinsured motorist insurance carrier's consent, although the policy contained a consent-to-settle clause. The trial court entered a summary judgment for the carrier, and this Court reversed. Justice Houston, writing for the Court, stated: *Page 165 
 "Underinsured motorist coverage provides compensation to the extent of the insured's injury, subject to the insured's policy limits. It is an umbrella coverage that does not require the insurer to pay to its insured the amount of the tort-feasor's bodily injury policy limits, as those limits pertain to the insured. Therefore, the insurer has no right to subrogation insofar as the tort-feasor's limits of liability are concerned. Its right of subrogation would be for sums paid by the insurer in excess of the tort-feasor's limits of liability."
531 So.2d at 887.
It has been stated many times that the purpose of § 32-7-23
is to provide full coverage for the insured. However, this Court has not yet clearly defined what procedures apply when an injured insured wants to settle with the tort-feasor and has not clearly delineated the rights and relations between the insured and his underinsured motorist insurance carrier in such circumstances.
The need is apparent, therefore, for some procedure that will release the insured from the "twilight zone" that he is placed in when the underinsured motorist insurance carrier does not want to give its consent to settle, or wants to protect its subrogation rights. This Court acknowledged in Hardy,531 So.2d 885, that the courts of some states have fashioned procedures that apply when an insured and his underinsured motorist insurance carrier are faced with facts such as are presented in this case, but Hardy does not specifically provide how an underinsured motorist insurance carrier can protect its right to be subrogated or prevent the possibility of collusion between the tort-feasor and his liability insurer. Although Alabama has no "bright line" case that provides specific guidance, this Court, in a number of cases, has given some direction, and we now undertake to give further directions and attempt to provide a road map for everyone concerned to follow. In the process of providing these procedures, we are attempting to ascertain legislative purpose and intent. If we have misconstrued legislative intent or purpose, the legislature is free to amend the statute and specifically provide, as some states have, for the procedures to be followed in such circumstances.
In adopting these procedures we have examined not only the cases decided by this Court that discuss the question, but those of other jurisdictions as well. One of the latest cases from this Court to address the issue is Auto-Owners Ins. Co. v.Hudson, 547 So.2d 467 (Ala. 1989). In Hudson, this Court, although not declaring consent-to-settle and subrogation clauses void, as the trial court had done in that case,[3] did hold as follows:
 "When the tort-feasor's liability insurer has offered to pay the maximum of its liability limits, and it is undisputed that the damages exceed that amount and, further, exceed the amount of underinsured coverage available, the insured should give its underinsured motorist insurance carrier notice of this offered settlement and the underinsured motorist carrier should consent to settlement and forgo any right of subrogation for any underinsured motorist coverage it may subsequently pay, or else pay to its insured the amount offered by the tort-feasor's insurer and preserve its right of subrogation."
547 So.2d at 469. (Emphasis added.) Hudson holds, therefore, that an insurer cannot refuse its consent for its insured to settle if the damages admittedly exceed the limits, not only of the liability policy, but of the underinsured policy as well.
The conflict that frequently develops between the insured and his underinsured motorist insurance carrier was emphasized inProgressive Specialty Ins. Co. v. Hammonds, 551 So.2d 333
(Ala. 1989). There, the executor of the insured's estate released the tort-feasor for the limits of his liability policy and thereafter sued the insured's *Page 166 
underinsured motorist insurance carrier to recover underinsured motorist benefits. The underinsured motorist insurance carrier filed a third-party claim against the tortfeasor. The trial court entered a summary judgment for the tort-feasor, stating that the insured had already released him. The majority of this Court affirmed, relying on Hardy and Hudson, and stated that the general rule was that a settlement and release of an underinsured tort-feasor will not automatically preclude recovery of underinsured motorist benefits. The majority of this Court held:
 " ' "When an insured party has given his underinsurance carrier notice of a tentative settlement prior to release, and the insurance carrier has the opportunity to protect its rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits. Schmidt [v. Clothier], 338 N.W.2d [256,] 263 [(Minn. 1983)]. If the tort-feasor is released before the insurance carrier makes payment to his insured, however, subrogation rights do not arise." ' "
Hammonds, at 336 (quoting Hardy v. Progressive Ins. Co.,531 So.2d 885, 887-88 (Ala. 1988)), quoting other cases. Hammonds
holds, therefore, that the insurer is entitled to have notice of a proposed settlement and should have the opportunity to protect its right of subrogation if it pays its insured the amount offered by the tort-feasor before the tort-feasor is released.
In writing many of our prior decisions dealing with the issue now before us, we have attempted to ascertain whether the legislature, in mandating that underinsured motorist benefits be provided to the holders of automobile liability policies, intended to restrict carriers from including consent-to-settle and subrogation clauses in those contracts of insurance. As just discussed, in those prior cases, we have not held that consent-to-settle and subrogation clauses are void, but we have placed many restrictions on their enforceability.
In resolving the issue now before us, we believe that we should apply both legal and equitable principles that will guarantee that the insured will receive the benefits of the bargain he has made, but that will, at the same time, protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor who was responsible for the injury or death and also protect the carrier against the possibility of collusion between the tort-feasor and his liability insurer at the insurer's expense.
The legislature has required that every insured under an automobile liability policy have the opportunity to purchase underinsured motorist coverage. However, it has not established any procedure by which the insured can settle with the tort-feasor. In a few states, the underinsured motorist statutes dictate the procedure for settlement.[4] As we have already pointed out, *Page 167 
our legislature has failed to provide a procedure whereby the insured and the underinsured motorist insurance carrier can protect their respective interests.
In this opinion, we set out the procedure that should be followed in every case in which the rights of the insured and the underinsured motorist insurance carrier may conflict.
Necessarily, any procedure must take into consideration the facts and circumstances of each individual case, but the following general rules should apply:
 (1) The insured, or the insured's counsel, should give notice to the underinsured motorist insurance carrier of the claim under the policy for underinsurance benefits as soon as it appears that the insured's damages may exceed the tortfeasor's limits of liability coverage.
 (2) If the tort-feasor's liability insurance carrier and the insured enter into negotiations that ultimately lead to a proposed compromise or settlement of the insured's claim against the tort-feasor, and if the settlement would release the tort-feasor from all liability, then the insured, before agreeing to the settlement, should immediately notify the underinsured motorist insurance carrier of the proposed settlement and the terms of any proposed release.
 (3) At the time the insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle, the insured should also inform the carrier as to whether the insured will seek underinsured motorist benefits in addition to the benefits payable under the settlement proposal, so that the carrier can determine whether it will refuse to consent to the settlement, will waive its right of subrogation against the tort-feasor, or will deny any obligation to pay underinsured motorist benefits. If the insured gives the underinsured motorist insurance carrier notice of the claim for underinsured motorist benefits, as may be provided for in the policy, the carrier should immediately begin investigating the claim, should conclude such investigation within a reasonable time, and should notify its insured of the action it proposes with regard to the claim for underinsured motorist benefits.
 (4) The insured should not settle with the tort-feasor without first allowing the underinsured motorist insurance carrier a reasonable time within which to investigate the insured's claim and to notify its insured of its proposed action.
 (5) If the uninsured motorist insurance carrier refuses to consent to a settlement by its insured with the tortfeasor, or if the carrier denies the claim of its insured without a good faith investigation into its merits, or if the carrier does not conduct its investigation in a reasonable time, the carrier would, by any of those actions, waive any right to subrogation against the tort-feasor or the tortfeasor's insurer.
 (6) If the underinsured motorist insurance carrier wants to protect its subrogation rights, it must, within a reasonable time, and, in any event before the tort-feasor is released by the carrier's insured, advance to its insured an amount equal to the tort-feasor's settlement offer.
These general guidelines should be applied with the understanding that the purpose of consent-to-settle clauses in the uninsured/underinsured motorist insurance context is to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between its insured and the tort-feasor's liability insurer at the carrier's expense.
We would point out that the tort-feasor's liability insurer has a higher duty than that of merely offering to pay the limits of its insured's liability policy. This Court has held that the insurer's duty to defend is more extensive than its duty to pay. See Universal Underwriters Ins. Co. *Page 168 v. Youngblood, 549 So.2d 76 (Ala. 1989); United States Fidelity Guar. Co. v. Armstrong, 479 So.2d 1164 (Ala. 1985); and Samplyv. Integrity Ins. Co., 476 So.2d 79 (Ala. 1985). Therefore, the liability insurer's duty to defend the tort-feasor could extend beyond that moment when the underinsured motorist insurance carrier elected to pay to its insured the amount offered by the tort-feasor's liability insurer.
This Court stated in Lowe v. Nationwide Ins. Co.,521 So.2d 1309 (Ala. 1988), that there are three primary concerns in an insurance claim involving underinsured motorist insurance coverage:
 "1) that of protecting the right of the [underinsured motorist insurance carrier] to know of, and participate in, the suit; 2) that of protecting the right of the insured to litigate all aspects of his claim in a single suit . . . and 3) that of protecting the liability phase of the trial from the introduction of extraneous and corrupting influences, namely, evidence of insurance. . . ."
521 So.2d at 1309.
We now apply these guidelines to the facts of this case. Ms. Lambert filed a claim with the tort-feasor's insurer, Alfa, and Alfa offered Ms. Lambert $7,500 to settle her claim. Ms. Lambert refused this offer, and the Lamberts subsequently filed a suit against the tort-feasor, Ms. Hall, in which they claimed damages in the amount of $250,000. State Farm, the Lamberts' underinsured motorist insurance carrier, was made aware of the $250,000 claim and closely monitored Alfa's investigation and settlement offers. When Alfa offered the Lamberts its policy limits of $25,000 in exchange for a complete release, the Lamberts notified State Farm of this offer. After State Farm refused to give its consent to this settlement offer, the Lamberts sued State Farm, alleging that the consent-to-settle clause in their underinsured motorist insurance policy was against public policy and void. One month before trial in the initial suit against Ms. Hall, the Lamberts informed State Farm that, regardless of State Farm's refusal to consent to the settlement with Ms. Hall and Alfa, they had agreed to accept the $25,000 and planned to execute a release.
The next day, State Farm offered to pay the Lamberts $25,000 in an attempt to retain its subrogation rights. The Lamberts refused to accept State Farm's "belated offer," and accepted the $25,000 from Alfa and signed a release of Ms. Hall and Alfa. State Farm then moved for a summary judgment in the Lamberts' suit against it. The trial court found that the Lamberts had breached their contract of insurance with State Farm by settling without State Farm's consent and, thus, entered a summary judgment in favor of State Farm.
We hold that the trial court erred, and we reverse its judgment. We have studied the record and we find that State Farm's refusal to consent to the proposed settlement offer, based on these facts, was unreasonable. If, in fact, as the record suggests, State Farm was convinced that its insureds' damages did not exceed $25,000, then its rights under the policy would be protected, because it ostensibly could prove to a factfinder that there was no liability under the underinsured motorist insurance policy. Applying the guidelines we have adopted, we believe that when State Farm evaluated the Lamberts' claim for damages, it should have paid them $25,000, the amount offered by Alfa, if it wanted to retain its right of subrogation against Ms. Hall and Alfa. Although State Farm did ultimately offer to pay the Lamberts $25,000, we find that, under the facts of this case, the offer was "belated," especially in view of the position State Farm was taking — that if the Lamberts settled, State Farm would refuse to pay any benefits under its underinsured motorist policy. In short, the record suggests that State Farm took the legal position that it had a right to insist on refusing to give its consent to the settlement.
Based on the foregoing, we conclude that State Farm, by its refusal to consent to the settlement or to timely advance the amount of the settlement offer, effectively waived its right to be subrogated, and that the Lamberts' acceptance of the settlement, under the facts of this case, does not affect *Page 169 
their rights under State Farm's underinsured motorist insurance policy.
Therefore, the judgment of the trial court is due to be reversed and the cause is due to be remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
HORNSBY, C.J., and JONES, SHORES and HOUSTON, JJ., concur.
[1] Davenport, Underinsured Motorist Coverage; Where Did it ComeFrom? Where is it Going?, 49 Ala. Lawyer 284 (Sept. 1988).
[2] In their brief, the Lamberts argue, in part, that although not new to the court, an issue that remains in dispute among the bench and bar is "whether a consent-to-settle clause is void [as] against public policy." During oral arguments in the case, counsel for the Lamberts suggested that a holding that consent-to-settle and subrogation clauses are void would be the best solution to the problem.
[3] The Lamberts, in their brief, correctly point out that the trial court in Hudson had held that consent-to-settle and subrogation clauses in the underinsured motorist policies in that case were null and void as violative of public policy as expressed by the legislature. See also the dissent of Maddox, J., in Hudson.
[4] N.C.Gen.Stat. § 20-279.21(b)(4) (1985) allows the underinsured motorist insurance carrier two options to preserve its subrogation right. If the insured claims underinsured benefits, the carrier, upon payment of the benefits, has the choice of receiving an assignment of the insured's claim against the tortfeasor or of being subrogated to that claim subject to the amount paid in underinsured motorist benefits. The carrier is given 30 days after it receives notice from its insured to evaluate the tort-feasor's settlement offer. If the insurer wishes to protect its subrogation right, it must, within 30 days, advance to its insured an amount equal to the tort-feasor's settlement offer. However, once the carrier receives notice of this settlement offer and refuses to make payment in this amount, the insured may collect underinsured motorist benefits even though the insured may have entered into a settlement and a release agreement without the required consent of the carrier. Thus, the consent-to-settle clause has no effect once the insured gives his underinsured motorist insurance carrier notice of the tort-feasor's settlement and release offer. The statute does not address, however, the rights of the carrier if the insured proceeds to settle without giving it notice of the settlement offer. Presumably, the contract would prevail.
Fla.Stat. § 627.727(6) (1987) provides that the insured must submit, in writing, any settlement offer he may have from the tortfeasor. The underinsured motorist insurance carrier then has 30 days during which to agree to arbitrate the underinsured motorist claim and approve the settlement, waive its subrogation rights against the liability insurer and its insured, and authorize the execution of a full release. If the underinsured motorist insurance carrier fails to agree, the insured may file suit joining the tort-feasor and the underinsured motorist insurance carrier to resolve their respective liabilities for any damages. However, the tort-feasor's liability coverage must first be exhausted before any award may be entered against the underinsured motorist insurance carrier.