**IN THE SUPREME COURT OF MISSISSIPPI**

**NO. 2001-CA-00334-SCT**

*UNITED STATES FIDELITY & GUARANTY*
*COMPANY*

*v.*

*ELIZABETH KNIGHT*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/05/2000 |
| TRIAL JUDGE: | HON. ALBERT B. SMITH, III |
| COURT FROM WHICH APPEALED: | COAHOMA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LUTHER T. MUNFORD |
| | CHARLES G. COPELAND |
| | REBECCA L. HAWKINS |
| | J. WADE SWEAT |
| ATTORNEYS FOR APPELLEE: | DANA J. SWAN |
| | RALPH EDWIN CHAPMAN |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND RENDERED - 06/24/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC**:

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is a bad faith insurance case brought by Elizabeth Knight against her uninsured motorist

insurance carrier, United States Fidelity & Guaranty Company(USF&G), following an automobile wreck.

Knight claims USF&G acted in bad faith by refusing to consent to a settlement offered to her by the alleged

tortfeasor's liability carrier.  A Coahoma County jury agreed, and awarded Knight $5,000,000 in punitive

damages.

**I.  Background Facts & Proceedings.**

¶2.     On December 9, 1988, Kenneth Boyett approached the intersection where Highway 322 formed a "T" with South State Street near Clarksdale, in Coahoma County. Boyett claims a couple of cars were ahead of him, stopped at the stop sign. As he attempted to stop, he found his brakes had failed,[1] so he moved into the left (oncoming) lane to avoid hitting the rear end of the stopped cars, and proceeded through the stop sign and struck the vehicle driven by Knight.

¶3.     At the time of the accident, Boyett was covered by an insurance policy issued by State Farm, which provided liability policy limits of $25,000.[2] Knight was covered by an insurance policy issued by USF&G, which provided uninsured motorist coverage of $300,000. It also contained a "consent" clause which stated that the policy did not provide uninsured motorist coverage for bodily injury "sustained by any person, if that person or the legal representative settles the "bodily injury" claim without [USF&G's] consent."

¶4.     The record provides little detail of the parties' activities for the five years following the accident. Apparently, having been put on notice of a potential claim, USF&G sent a representative to investigate at the end of 1992. The investigator's notes, offered into evidence, indicate that State Farm had previously made an offer to Knight's brother, who was acting as her attorney at the time,[3] to pay the $25,000.00 liability policy limits in exchange for a release of Boyett.

---

[1]In his answer to the Complaint, answer to the Amended Complaint, response to written discovery and in deposition, Boyett has consistently claimed his brakes failed, and that the accident was unavoidable.

[2]The State Farm policy is not a part of the record before this Court.

[3]Knight's brother was an attorney in Louisiana.

¶5.     Thereafter, Knight hired William G. Willard, Jr., as local counsel and, on June 28, 1993, filed a negligence suit against Boyett and USF&G, demanding compensatory damages of $325,000.  Both defendants answered and denied liability, claiming that the accident was not due to negligence, but rather to the sudden, unexpected brake failure for which Boyett would not be liable.

¶6.     Knight filed a motion for summary judgment on May 12, 1995, claiming Boyett was negligent and, thus, liable as a matter of law.  The trial court denied the motion, holding that genuine issues of triable fact existed as to the issue of Boyett's liability.

¶7.     On June 14, 1995, Willard[4] sent a letter to USF&G's counsel, C. Richard Benz, Jr., which:

   .     informed him that State Farm had offered to pay its liability policy limits of $25,000, in exchange for a release from liability for its insured, Boyett;

   .     alleged his investigation indicated that Boyett was "probably judgment proof" or if not judgment proof, then "probably has very limited assets. . . .";

   .     requested USF&G to approve the settlement and, in effect, waive its subrogation rights against Boyett.

¶8.     On behalf of USF&G, Benz responded on July 24, 1995, refusing to waive subrogation rights, and demanding that Knight comply with the policy provision which required her to do nothing to prejudice USF&G's subrogation rights.  Benz pointed out that both liability and damages were contested.

¶9.     Having said that, Benz communicated an offer from USF&G to Knight with the following provisions:

   .     USF&G would pay $25,000 to Knight;

_____

[4]Willard subsequently withdrew as Knight's counsel because he was appointed (and later elected) to the chancery court bench.  He would later serve as a witness for Knight at trial.

- Knight would "take no actions which would prejudice or impair USF&G's right of subrogation;

- USF&G would be entitled to a $25,000 credit against any recovery made by Knight against Boyett or USF&G;

- If Knight recovered less than $25,000 against Boyett or USF&G, she would "repay USF&G, plus interest, that amount equal to the difference between $25,000 and the amount of the verdict or judgment."

- In the event of a verdict of $25,000 to $50,000, Knight would repay USF&G "any amount equal to the difference between [the] amount of [the] verdict and $25,000," together with interest;

- Subject only to the agreement, Knight would retain all her rights to pursue the litigation against Boyett and USF&G.

¶10.    Knight's response to the offer was provided by Willard in an August 7, 1995 letter which stated that the offer was "unacceptable" and "in all probability contrary to Mississippi law." Willard opined that, since State Farm had offered $25,000 for a release of its insured, the ultimate value of Knight's claim was immaterial. Willard demanded that USF&G either consent to the settlement with State Farm, thereby waiving its subrogation rights, or pay the $25,000 with "no strings attached."

¶11.    In its response provided on August 22, 1995, through its counsel, Marc A. Biggers, USF&G pointed out that Knight's refusal to accept the previous offer seemed inconsistent with a good faith belief that her claim exceeded $25,000.[5] The letter further stated that, since Knight had threatened to "collect all damages directly from USF&G and not Mr. Boyett," USF&G was willing to deal directly with Knight, and would offer her $25,000, in exchange for "a dismissal of [sic] prejudice of a lawsuit as against

---

[5]USF&G's rationale was that, if Knight accepted USF&G's previous offer and later recovered more than $25,000, there was no scenario under which she would be at a disadvantage, because she would receive $25,000 immediately, and she would end up receiving her full award, up to the $300,000 policy limit.

USF&G, a release executed in favor of USF&G as well as an assignment from Ms. Knight of all rights to recover against Mr. Boyett." We find no response to this letter in the record.

¶12.    On March 3, 1998, Circuit Judge John Hatcher entered an order bifurcating and separating the personal injury claim and the bad faith claim. Then, inexplicably, on March 8, 2000, Judge Hatcher entered an order which purported to be in response to a motion filed by defendant.[6] The order "severed" the bad faith claim from the "remaining portions of Plaintiff's suit against Kenneth Boyett and [USF&G]," and ordered that the bad faith claim against USF&G be tried prior to the underlying tort claim.[7]

¶13.    The bad faith claim was then set for trial,[8] which began on September 18, 2000, and concluded on September 21, 2000, with a verdict for Knight, against USF&G, in the amount of Five Million dollars in punitive damages.

¶14.    USF&G now brings this appeal, claiming numerous instances of reversible error. We will address only those necessary for disposition of the case.

## II. Analysis.

¶15.    The record in this case casts considerable doubt as to whether anyone clearly understood the nature of Knight's suit against USF&G. For instance, instruction P-11B, given by the court, provided that,

---

[6]No motion subsequent to the March 3, 1998 Order could be located in the record or on the Circuit Clerk's docket pages in this case.

[7]We are unable to locate any case where a trial judge has ordered the parties to try the issue of punitive damages prior to trying the underlying claim for damages. We are provided no explanation for this unprecedented order which, according to the record, was entered without a request by either party.

[8]Because of the death of Circuit Judge Hatcher, Circuit Judge Albert B. Smith, III, presided at trial.

in order to recover punitive damages, the plaintiff was required to prove "USF&G denied payment of her claim without an arguable reason." This case involved neither a claim nor the denial of one by USF&G.

¶16.    As another example, beginning with her counsel's August 7, 1995 letter, Knight has consistently charged USF&G with bad faith for its "unreasonable" refusal to consent to the settlement offer made by State Farm. Nevertheless, the court granted jury instruction D-12, which stated:

> The Court instructs the jury that the consent clause is not a mere notice clause. The duty of good faith and fair dealing does not require USF&G to give up rights it has pursuant to the contract. The consent clause is a legal right of USF&G under the insurance contract and USF&G's refusal to consent cannot be the basis for a finding of bad faith.

¶17.    The record reflects considerable confusion at trial as to whether Knight was required to pursue (or indeed did pursue) compensatory damages, as a prerequisite to recovery of punitive damages. Knight's counsel initially claimed that Judge Hatcher's order (requiring the bad faith claim to be tried prior to the tort claim) eliminated the usual requirement to prove compensatory damages suffered by Knight as a result of the accident. This exchange then took place:

> BY THE COURT: Accepting your position on that, do you have to prove compensatory damages? And if so, are they the $25,000 that was tendered?
> BY MR. CHAPMAN: Well, do we have to prove it? Yes, we have proven that – we proved to the Court and to the jury, and hopefully to USF&G that we were entitled to the $25,000.00 offered by State Farm. . . . So yes, we've proved our damages. If that jury had concluded that what we were seeking; that is, consent, was inappropriate – it was inappropriate for USF&G to withhold consent, which they ultimately found by virtue of their verdict, then the damages are the $25,000, which we proved, but the jury didn't award, because we didn't ask them to award it in this case. This was from another party that had offered us the $25,000.

¶18.    The record reflects no demand at trial for compensatory damages, no jury instruction which would guide the jury in awarding compensatory damages, and no award of compensatory damages.

¶19.    Finally, the record casts doubt as to whether Knight carefully analyzed the counter offer from USF&G. Upon doing so, we find no set of circumstances under which she would have fared worse than any recovery she might have received at trial. We also fail to find any detriment[9] to her to accepting USF&G's counter offer, as opposed to settling with Boyett. We cannot guess her reason for refusing the offer, and we certainly cannot see a basis for rejecting the offer out of hand, with no suggested changes or counter offer, and filing a "bad faith" lawsuit. Nevertheless, her reasons are immaterial at this point.

*1. Knight's Claim.*

¶20.    Taking the record as a whole, the claim the trial court allowed Knight to pursue against USF&G may be fairly stated as follows:

A. USF&G had a contractual obligation, under the circumstances of this case, to either (1) consent to the $25,000 settlement offered by State Farm to Knight, thereby waiving USF&G's statutory and contractual subrogation rights; or (2) fund the settlement by payment of $25,000 to Knight, and proceed to attempt to recover the payment from either Boyett or State Farm;

B. USF&G breached the contract by its refusal to do either; and

C. The breach was in bad faith.

¶21.    Also from the record, we conclude that USF&G defended by claiming it had no obligation, contractual or otherwise, to approve or fund the settlement. Alternatively, if it did, it was not breached because of its offer to advance $25,000 to Knight. Alternatively, if it did breach an obligation, it did not do so in bad faith. USF&G raises numerous other assignments of error which we need not address.

---

[9]With the possible exception of interest she would pay on the money advanced to her.

7

*2. Did USF&G Have a Contractual Obligation to Consent To The Settlement?*

¶22.    We begin this analysis by setting forth the relevant provisions in Knight's USF&G insurance

agreement:

> PART C–UNINSURED MOTORIST COVERAGE
>     INSURING AGREEMENT
>
> A.    We will pay damages which an "insured" is legally entitled to recover from
>        the owner or operator of an "uninsured motor vehicle" because of "bodily
>        injury:"
>
>> 1.  Sustained by an "insured" and
>>
>> 2.  Caused by an accident. . . .
>>        . . . .
>> Any judgment for damages arising out of
>> a suit brought without our consent is not
>> binding on us.
>
>    EXCLUSIONS
>
> A.    We do not provide Uninsured Motorist Coverage for "bodily injury"
>        sustained by any person:
>                   . . . .
>        2.        If that person or the legal representative settles the "bodily
>                  injury" claim without our consent.
>
> PART F–GENERAL PROVISIONS
>
>    OUR RIGHT TO RECOVER PAYMENT
>
> A.    If we make a payment under this policy and the person to or for whom
>        payment was made has a right to recover damages from another we shall
>        be subrogated to that right.  That person shall do:
>
>    1.  Whatever is necessary to enable us to exercise our rights; and
>
>    2.  Nothing after loss to prejudice them.
>                   . . . .

B.      If we make a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall:

    1.  Hold in trust for us the proceeds of the recovery, and

    2.  Reimburse us to the extent of our payment.

¶23.    The policy provides in clear, unambiguous language that Knight would have no uninsured motorist coverage if she settled her claim with Boyett without USF&G's consent.[10]  While Knight does not contest the validity of the "consent" provision, she argues that USF&G must be "reasonable" in exercising its rights under the provision.  She cites some authority for this proposition.

¶24.    Relying on *Murriel v. Alfa Ins. Co.*, 697 So. 2d 370 (Miss. 1997), handed down by this Court only one month following the filing of Knight's amended complaint, Knight contends that USF&G could not unreasonably refuse to consent to the settlement offered by State Farm.  Knight further contends that *Murriel* stands for the proposition that USF&G was obligated to either consent to the settlement, or fund the settlement, that is to say, USF&G was obligated to either waive its statutory right of subrogation, or pay the full settlement amount to Knight, and attempt to recover the payment from Boyett or State Farm.  Because *Murriel* was the primary law relied upon by the trial court and the parties, we shall discuss it in some detail.

¶25.    Kimberly Murriel, an infant, was injured in an automobile accident caused by the negligence of an underinsured motorist whose liability carrier, Dixie Insurance Company, offered its policy limits of $10,000, to settle the claim.  Since Murriel's UM policy, issued by Alfa Insurance Company, contained a "consent"

---

[10]The policy provision requiring consent to settle is common in the uninsured motorist insurance industry.

provision, Murriel's attorney requested Alfa to "waive their subrogation rights." *Id.* Alfa responded, as follows:

> As I informed you in our telephone conversation, the case of *State farm Mutual Automobile Ins. Co. verses (sic) Susan T. Kuehling,* 475 So.2d 1159, allows for an offset of the tort feasor's liability coverage. It is my understanding that the adverse liability carrier, Dixie Insurance Company, has already interpled their policy limits of $20,000.00.[11] Therefore, this would preclude your clients from having an uninsured motorist claim.

*Id.* (footnote not in original).

¶26. We conclude that this Court did not correctly decide *Murriel*. Clearly, since Alfa's UM policy limits were the same as Dixie's liability limits, Alfa had no coverage -- thus, no subrogation to waive. Alfa's response to Dixie was adequate and appropriate, and this Court should have so held. Thus, to that extent, we overrule *Murriel*.

¶27. However, contrary to Knight's argument, *Murriel* was silent as to whether Alfa was required to exercise its discretion reasonably. The decision held only that it could not ignore a request that it waive subrogation.

¶28. Finally, *Murriel* provided no authority for awarding punitive damages. *Murriel* held that "an insurer may waive any right to invoke the consent defense when the insurer does not respond within a reasonable time to an insured's request for consent." 697 So. 2d at372. The Court did not speak to, or suggest, any other remedy.

---

[11]Policy limits were $10,000 per person, $20,000 total. Thus, there was a $10,000 limit applicable to Debrah Murriel.

¶29.     This leaves us with the open question of whether USF&G had an obligation to consent to the settlement, absent a reasonable basis for its refusal.  For the reasons discussed below, we hold that it did.  We now turn to the question of whether that obligation was breached.

### 3.  Did USF&G Breach Its Obligation to Consent To The Settlement?

¶30.     Under ordinary contract law, where parties negotiate and enter a contract at arm's length, courts will enforce clear, unambiguous provisions exactly as written.  Thus, where one party is granted absolute discretion to exercise a right, and has given consideration for that right, there is no requirement that the party give a good reason or reasonable explanation for withholding consent.  The same basic concept prevents this Court from inquiring into the adequacy of consideration.

¶31.     However, insurance policies (while technically contracts) are different.  Insurance companies and their insureds have a different relationship than most contracting parties.  For instance, both share the same agent.  And other than speaking to and through the common agent, they seldom communicate.

¶32.     Certainly, insurance policies are to be enforced according to their provisions.  And insurance companies must be able to rely on their statements of coverage, exclusions, disclaimers, definitions, and other provisions, in order to receive the benefit of their bargain, and to ensure that rates have been properly calculated.  A rate calculated in reliance on an exclusion will, in most instances, be incorrect where courts invalidate the exclusion.  But where the policy grants discretion to the insurance company, it must be exercised reasonably.

¶33.     Today, we reaffirm and expand this Court's previous holding in ***United States Fidelity and Guaranty Co. v. Hillman***, 367 So. 2d 914 (Miss. 1979), where we held that "where the uninsured motorist statutes grant an insurer the right of subrogation and a provision in the policy precludes settlement

11

with an uninsured motorist without the consent of the insurer, the provision of the policy is valid and will be upheld." *Id.* at 921.

¶34.    We further hold that, so long as an insurer provides an arguable basis for its refusal to consent to the settlement, its right to subrogation will be protected. However, should an insurer withhold consent with no reasonable basis for doing so, it will lose its subrogation rights. And where an insured demonstrates that the insurance company withheld consent with no arguable basis, solely for the purpose of gaining some new advantage not provided under the policy, such as coercing a settlement, the trial court may consider whether to submit the matter to the jury on punitive damages.

### 4. Burden of Proof for Punitive Damages.

¶35.    USF&G argues that the trial court erred in allowing the jury to consider punitive damages under the "preponderance of the evidence" standard, rather than the "clear and convincing" standard. Because we are reversing and rendering this case on other grounds, we do not need to reach this issue.

## II. Conclusion.

¶36.    Applying our findings today to the case sub judice, we hold that USF&G had an arguable basis for withholding its consent to the settlement. The record reflects that Boyett had some assets and a job. Thus, USF&G would have the ability to pursue reimbursement from him of any payment made under its policy. Furthermore, in the event Knight settled with Boyett, USF&G would be left facing a trial where Knight was seeking $300,000. Since Boyett would have been released from all liability, his incentive to cooperate in defending the allegation that he was negligent would be severely diminished. Keeping Boyett in jeopardy of a judgment against him, whether collectable or not, would make it more likely that he would offer a passionate denial of liability at trial.

12

¶37. Knight also claims that, as an alternative to consenting to the settlement, USF&G could have paid $25,000 to her with "no strings attached." We find no support or justification in our law, or in other jurisdictions, for forcing an insurance company to fund a settlement between third parties, where (as here) the insurance company had a reasonable basis for its refusal to consent to the settlement.

¶38. Because we find that USF&G had an arguable basis for its refusal to consent to the settlement and waive its subrogation rights, the claim for punitive damages is without merit.

¶39. Therefore we reverse the circuit court's judgment, and we render judgment here that Elizabeth Knight take nothing from USF&G on her claim for punitive damages, and that Knight's claim of bad faith and for punitive damages in the amended complaint are finally dismissed with prejudice.

¶40. **REVERSED AND RENDERED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., AND CARLSON, J., CONCUR. EASLEY, J., DISSENTS WITHOUT SEPARATE OPINION. RANDOLPH, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

**RANDOLPH, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶41. I agree with the majority to the extent that the instant case should be reversed and that the $5,000,000 punitive damage verdict should be set aside and held for naught. However, the matter should be remanded for further proceedings.

¶42. In January of 1993, Knight filed a negligence action against Boyette and a claim for uninsured motorist benefits against her insurer, U.S.F.&G. The circumstances surrounding the wreck might lead a jury to conclude that Boyette was at fault, but to date there has been no proceedings to determine such.

13

Depending on Boyette's explanation, a jury will be required to determine his negligence vel non. Should the jury determine Boyette to be without fault, the plaintiff is entitled to nothing from either Boyette or U.S.F.&G.

¶43.    Boyette had $25,000 of liability coverage, while Knight's U.S.F.&G. policy provided uninsured motorist coverage of $300,000. Prior to trial, Boyette's liability carrier offered to pay its policy limits in exchange for a complete and full release. Knight informed U.S.F.&G. of this offer and asked for its consent to settle as required in their insurance contract. U.S.F.&G. declined to consent, but offered a loan subject to certain terms for an amount equal to the settlement offer. Knight considered the terms of the offer oppressive and in 1997, amended her complaint to include a bad faith claim against U.S.F.&G.

¶44.    The trial court severed the underlying claim and the bad faith claim, but for reasons unknown tried the bad faith claim first. During this trial, the trial court refused to allow testimony regarding actual damages suffered by Knight. The trial resulted in a $5,000,000 punitive damage verdict against U.S.F.&G.

¶45.    The existence of actual damages is a necessary prerequisite to the jury's right to consider and assess punitive damages. *Herrington v. Spell*, 692 So.2d 93, 104 (Miss. 1997); *Hopewell Enters., Inc. v. Trustmark Nat'l Bank*, 680 So.2d 812, 820 (Miss. 1996). Section 11-1-65 addresses punitive damages and explicitly provides that only if an award of compensatory damages is rendered may proceedings regarding punitive damages begin. Miss. Code Ann. § 11-1-65(b) & (c) (2001 Supp.)[12]

---

[12]  Specifically, § 11-1-65 provides in part:

(1) In any action in which punitive damages are sought:
*******
(b) In any action in which the claimant seeks an award of punitive damages, the trier of fact shall first determine whether compensatory damages are to be awarded and in what

¶46.    Typically, § 11-1-65 is not applicable to cases arising out of a breach of contract. *See* Miss. Code

Ann. § 11-1-65(2)("The provisions of Section 11-1-65 shall not apply to: (a) Contracts;"). However, this

Court has stated:

> The rule in Mississippi is settled that punitive damages are not recoverable for a breach of
> contract unless such breach is attended by intentional wrong, insult, abuse, or such gross
> negligence that amounts to an independent tort. ***New Hampshire Ins. Co. v. Smith***,
> 357 So.2d 119 (Miss.1978)....but,
> If the Appellant had a legitimate, allowable or arguable reason not to pay the claim of the
> Appellee, then punitive damages will not lie. (*Cites omitted*.)
> ***Aetna Cas. & Sur. Co. v. Steele***, 373 So.2d 797, 801 (Miss.1979).

in ***Employers Mutual Casualty Co. v. Tompkins***, 490 So.2d 897, 903 (Miss. 1986)   Thus, since

the instant appeal arises from an alleged independent tort of bad faith, § 11-1-65 is applicable. There was

no verdict regarding the underlying personal injury claim or the uninsured motorist claim.   In order to

recover punitive damages, Knight must first prove her underlying claims before any duty to pay arises.

Should she succeed on the underlying claims, Knight then must first demonstrate to the trial court that there

was no arguable or legitimate reason for U.S.F.&G.'s refusal to consent and/or pay a claim.   Finally,

Knight must demonstrate that the refusal rose to the level of an independent tort, as defined in prior

decisions of this Court.

---

amount, before addressing any issues related to punitive damages.

(c) If, but only if, an award of compensatory damages has been made against a party, the
court shall promptly commence an evidentiary hearing before the same trier of fact to
determine whether punitive damages may be considered.

¶47. The $5,000,000 verdict should be reversed and the proceedings remanded for a trial on all issues. If during the trial facts are developed to support a bad faith claim, then Knight should not be precluded from pursuing same. However, no basis for a bad faith claim exists in the record presently before this Court.

¶48. Finally, I agree with the majority regarding the facts of *Murriel v. Alfa Ins. Co.*, 697 So.2d 370 (Miss. 1997), in that there was no uninsured motorist coverage to be provided by Alfa Insurance. In *Murriel*, this Court held an insurer may waive any right to invoke the consent defense (for a denial of coverage) if it fails to respond within a reasonable time to an insured's request for such consent. *Id.* at 372 (citing *Lambert v. State*, 576 So.2d 160 (Ala. 1991)). Unlike *Murriel*, the instant case involves allegations regarding wrongful refusal to consent as opposed to issues of waiver resulting from a failure to respond. Though the facts in *Murriel* did not truly provide an uninsured motorist issue, it is today overruled. This does not negate the fact that coupled with an insurer's contractual right to consent & subrogation is a duty to respond in a reasonable time and manner to an insured's request for consent.