611 So.2d 348 (1992)
ALLSTATE INSURANCE COMPANY
v.
Donald BEAVERS.
1910912.
Supreme Court of Alabama.
December 11, 1992.
*349 Barbara F. Olschner and Alice W. Durkee of Olschner & Associates, P.C., Birmingham, for appellant.
Garve Ivey, Jr. of Wilson & King, Jasper, for appellee.
MADDOX, Justice.
This case presents a question of whether an insured, who was injured in an automobile accident, waived his right to receive underinsured motorist insurance benefits because he settled with the tort-feasor and the tort-feasor's liability insurance carrier and gave a full release without notifying his carrier of underinsured motorist insurance.
The facts are essentially undisputed. The insured, Donald Beavers, was injured in an automobile accident on March 9, 1990. He hired an attorney, Garve Ivey, who represented him in his claim against (1) John Kenneth Cochran, a minor, and (2) Ronald L. Cochran, the minor's father, who owned the other vehicle. Both Cochrans were insured by Alfa Insurance Company (Alfa), with liability limits of $25,000.
Beavers had an automobile liability policy with Allstate Insurance Company that included coverage for underinsured motorist benefits. It contained the following provisions:
"Part VUninsured Motorist Insurance (Coverage SS):
"ExclusionsWhat is not covered.
"This coverage does not apply to:
"(1) Any person insured who makes a settlement without our written consent.
"....
"Assistance and Cooperation.
"We may require the person insured to take appropriate action to preserve all rights to recover damages from anyone responsible for the bodily injury."
Beavers's attorney notified Allstate on April 17, 1990, of the accident and that it "could possibly be a case of uninsured coverage." On May 1, 1990, Allstate wrote to Beavers's attorney, requesting that he send Beavers's medical records. In the letter, Allstate also notified the attorney that it had subrogation rights under the policy and requested that the attorney notify Allstate before Beavers signed a release.
On May 9, 1990, Beavers's attorney wrote to a senior staff claim representative for Allstate, stating that "if it in fact develops that there is an uninsured motorist claim, I will look forward to working with you." On July 16, 1990, an agent of Allstate wrote to the attorney and asked for the status of the underinsured motorist claim. On July 24, 1990, the attorney wrote Allstate, stating that he had not settled with the tort-feasor's carrier, Alfa, and that as soon as he had "a handle" on the total medical bills, he would contact Allstate again. On July 30, 1990, Beavers's attorney wrote Allstate again, enclosing a copy of Beavers's medical bills and a copy of the demand letter to an Alfa adjuster.
Between July 30, 1990, and December 12, 1990, there was no communication between Allstate and Beavers or his attorney. Allstate received no information and made no investigation concerning the status of Beavers's possible underinsured motorist claim or the status of Beavers's claim against the tort-feasor. On December 13, 1990, Beavers settled his claim with the tort-feasor, accepted a settlement check, and executed a full and final release. On that same day, Beavers's attorney contacted Allstate by telephone and notified it that Alfa had paid its limits and that he wanted to conclude the case by year's end. Allstate requested evidence of Alfa's policy limits, evidence that Alfa had tendered those limits, and a list of medical expenses Beavers was claiming as a result of the accident. Beavers's attorney agreed to provide all of the requested information. On December 18, 1990, Allstate wrote Beavers's attorney and again asked for the information that had been requested by telephone on December 13, 1990. On January 7, 1991, without providing any of the information requested by Allstate on December 13 and *350 December 18, 1990, Beavers's attorney wrote Allstate, demanding the policy limits of Beavers's underinsured motorist coverage.
On January 9, 1991, Allstate contacted Alfa and learned that a release had already been executed. Allstate requested a copy of the release from Alfa. On January 11, 1991, Allstate wrote Beavers's attorney to inform him that it had learned that a release had been executed and to ask for a copy of the release so that it could determine how to proceed. On January 18, 1991, Alfa sent Allstate, via telecopier, a copy of the release that Beavers had executed on December 13, 1990.
On February 8, 1991, Allstate filed a complaint in the Circuit Court of Jefferson County, seeking a judgment declaring that Beavers was precluded from recovering under the uninsured/underinsured motorist coverage provisions of his automobile liability policy on the ground that he had executed a full and final release of the tort-feasor without notifying Allstate of his intent to do so. The declaratory judgment action was transferred to the Circuit Court of Walker County, pursuant to Rule 82(d)(1), Ala.R.Civ.P., based on the consent of the parties.
On the same day that Allstate filed its declaratory judgment complaint, Beavers filed a complaint against Allstate in the Circuit Court of Walker County, alleging breach of contract, fraud, and bad faith failure to pay the insurance claim. On August 2, 1991, the circuit court of Walker County consolidated the two actions.
Subsequently, Allstate moved for a summary judgment based upon Beavers's failure to give Allstate notice of his settlement with the tort-feasor before accepting the settlement and executing a release. The trial court denied Allstate's summary judgment motion. The trial court also denied Allstate's motion to correct certain statements in its summary judgment order that Allstate argued were incorrect or that were highly contested. Allstate then petitioned pursuant to Rule 5, Ala.R.App.P., for permission to appeal the court's interlocutory order denying its motion for summary judgment. This Court granted permission to appeal.
The rules governing summary judgments require that a trial court, in order to properly enter a summary judgment, determine (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to a judgment as a matter of law. Rule 56, Ala.R.Civ.P.; Berner v. Caldwell, 543 So.2d 686, 688 (Ala.1989) (quoting Schoen v. Gulledge, 481 So.2d 1094 (Ala. 1985)). On review, in determining whether a party was entitled to a summary judgment, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law, and, of course, we must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986). See also Hanners v. Balfour Guthrie, Inc., 564 So.2d 412 (Ala.1990).[1]
Allstate, in its brief, succinctly states the issue:
"Must a plaintiff give his underinsured motorist carrier notice of a proposed settlement with the tort-feasor's carrier prior to executing a release of the tort-feasor to preserve his right to pursue underinsured motorist benefits?"
This Court has addressed the rights of an insured and his uninsured/underinsured *351 motorist insurance carrier on several occasions, but we have not addressed the question in light of the facts in this record, which show that the insured, Beavers, although he notified Allstate of the possibility of a claim and of the fact that the tort-feasor had some insurance coverage, nevertheless, did not notify Allstate of his settlement with the alleged tort-feasor and the tort-feasor's carrier until after he had settled and executed a release.
In Lambert v. State Farm Mutual Insurance Co., 576 So.2d 160 (Ala.1991), this Court reviewed the history and the underlying purpose of consent-to-settle clauses in uninsured/underinsured motorist insurance contracts in view of the provisions of Ala. Code 1975, § 32-7-23. This Court, in Lambert, also reviewed the earlier decisions leading up to that case,[2] where this Court established procedures to be followed in cases involving the rights of an insured and the underinsured motorist insurance carrier. Although each case presents different facts and circumstances that must be considered, the following general rules provide a guideline in deciding these cases:
"(1) The insured, or the insured's counsel, should give notice to the underinsured motorist insurance carrier of the claim under the policy for underinsurance benefits as soon as it appears the insured's damages may exceed the tort-feasor's limits of liability coverage.
"(2) If the tort-feasor's liability insurance carrier and the insured enter into negotiations that ultimately lead to a proposed compromise or settlement of the insured's claim against the tort-feasor, and if the settlement would release the tort-feasor from all liability, then the insured, before agreeing to the settlement, should immediately notify the underinsured motorist insurance carrier of the proposed settlement and the terms of any proposed release.

"(3) At the time the insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle, the insured should also inform the carrier as to whether the insured will seek underinsured motorist benefits in addition to the benefits payable under the settlement proposal, so that the carrier can determine whether it will refuse to consent to the settlement, will waive its right of subrogation against the tort-feasor, or will deny any obligation to pay underinsured motorist benefits. If the insured gives the underinsured motorist insurance carrier notice of the claim for underinsured motorist benefits, as may be provided for in the policy, the carrier should immediately begin investigating the claim, should conclude such investigation within a reasonable time, and should notify its insured of the action it proposes with regard to the claim for underinsured motorist benefits.
"(4) The insured should not settle with the tort-feasor without first allowing the underinsured motorist insurance carrier a reasonable time within which to investigate the insured's claim and to notify the insured of its proposed action.
"(5) If the [underinsured] motorist insurance carrier refuses to consent to a settlement by its insured with the tort-feasor, or if the carrier denies the claim of its insured without a good faith investigation into its merits, or if the carrier does not conduct its investigation in a reasonable time, the carrier would, by any of those actions, waive any right to subrogation against the tort-feasor or the tort-feasor's insurer.
"(6) If the underinsured motorist insurance carrier wants to protect its subrogation rights, it must, within a reasonable time, and, in any event before the tort-feasor is released by the carrier's insured, advance to its insured an amount equal to the tort-feasor's settlement offer."
576 So.2d at 167 (emphasis added). The Lambert Court also made the following recommendation in applying these rules:
"These general guidelines should be applied with the understanding that the purpose of the consent-to-settle clauses in the uninsured/underinsured motorist *352 insurance context is to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between its insured and the tort-feasor's liability insurer at the carrier's expense."
576 So.2d at 167.
Beavers argues, as the trial court had held, that Allstate's motion for summary judgment was properly denied on the basis that Allstate failed to properly investigate the claim after being informed on April 17, 1990, of the possibility of an underinsured motorist insurance claim. In short, Beavers contends that his notice to Allstate of the possibility of an underinsured motorist insurance claim placed a duty on Allstate to conduct an investigation to determine whether to consent to the settlement that Beavers later entered into without notifying Allstate. Beavers relies on the following language from Lambert for this proposition:
"If the uninsured motorist insurance carrier ... does not conduct its investigation in a reasonable time, the carrier would, by [that action], waive any right to subrogation against the tort-feasor or the tort-feasor's insurer."
576 So.2d at 167.
The trial court based its denial of Allstate's motion for summary judgment upon its determination that Allstate's lack of investigation following the "notice" of April 17, 1990, constituted a waiver of its right to subrogation against the tort-feasor. The order accurately reflects that the "notice" Allstate received on April 17, 1990, was notice that "the claim could possibly involve underinsured coverage."
Beavers's argument, insofar as that argument is made in support of his action against Allstate alleging fraud and bad faith failure to pay, has no merit. The facts in this record show, as a matter of law, that Allstate was not guilty of fraud or of a bad faith failure to pay the claim.
Beavers's argument, as it relates to his contract claim, however, is more persuasive, but his argument, insofar as it relates to that claim, seems to ignore the procedural requirement of Lambert that it is the notice of the proposed settlement that legally, and logically, requires action within a reasonable time by the underinsured motorist insurance carrier. Although the record shows that Beavers's attorney and Allstate corresponded about the claim, it is undisputed that neither Beavers nor his attorney notified Allstate before he executed the release.[3]
In Lambert, this Court said that the guidelines there set out "should be applied with the understanding that the purpose of consent-to-settle clauses in the uninsured/underinsured motorist insurance context is to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between its insured and the tort-feasor's liability insurer at the carrier's expense." 576 So.2d at 167.
Under the guidelines set forth in Lambert, it is the insured's notice to the carrier of his intention to seek underinsured motorist insurance benefits "[a]t the time insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle" that requires the carrier to investigate the claim in order to determine whether to protect its subrogation rights. 576 So.2d at 167. See also Jones v. Allstate Ins. Co., 601 So.2d 989 (Ala.1992); Brantley v. State Farm Mutual Auto. Ins. Co., 586 So.2d 184 (Ala.1991).
Applying these guidelines to the facts of this case, the question is: Did Beavers or his attorney give sufficient notice to Allstate of the proposed settlement? We think not. It is undisputed that Allstate had no knowledge of the proposed settlement or of the terms of the settlement.
Beavers's argument is that he gave Allstate notice, as required by Lambert, by letter and by telephone,[4] and that Allstate's *353 duty to investigate was triggered as early as April 17, 1990, when his attorney notified Allstate of the possibility of a claim under the policy. As this Court said in Brantley v. State Farm Mutual Auto. Ins. Co., 586 So.2d 184 (Ala.1991), "[w]e are mindful of the fact that each case presents different facts and circumstances and must be treated accordingly"; we, nevertheless, held in that case that the summary judgment was appropriate under the facts of that case. In Brantley, of course, there was no notice given to State Farm by Brantley of his intent to file a claim until after he had settled with the tort-feasor and had executed a release. Here, there was notice given to Allstate that a claim might be made under the policy. The question, of course, is whether, based on the particular facts and circumstances of this case, Allstate was put on notice, under the Lambert guidelines, that a claim for underinsured motorist insurance benefits would be made, or on notice of its insured's intent to settle with the tort-feasor and the tort-feasor's carrier? We think not. As this Court stated in Brantley, each case must be decided on its particular facts and circumstances.
The real question presented is whether the facts and circumstances in this case show, as a matter of law, that the insured waived his right to uninsured motorist insurance benefits by settling with the tort-feasor and the tort-feasor's carrier without notifying Allstate of his intent to settle and to file a claim against Allstate under its policy.
Based on the facts and circumstances before us, we hold that the trial court improperly denied Allstate's motion for summary judgment as to each of Beavers's claims. Lambert clearly requires that, before Beavers made any final settlement, he must have given Allstate reasonable notice of his intent to file a claim for underinsured motorist insurance benefits. Brantley, 586 So.2d at 187-88. Beavers settled with Alfa and did release Alfa's insured from all liability. Before doing this, Beavers did not provide Allstate with adequate notice of the proposed settlement and of the terms of the release, as required by the Lambert guidelines, for Allstate to adequately protect its subrogation rights. Consequently, Allstate never had the opportunity to consent to, or to refuse to consent to, the settlement agreement entered into by Beavers. Id.
The order of the trial court denying Allstate's motion for summary judgment on Beavers's claims is due to be, and it is hereby, reversed, and the cause is remanded for the entry of a judgment for Allstate on those claims.
REVERSED AND REMANDED.
HORNSBY, C.J., and HOUSTON, STEAGALL and INGRAM, JJ., concur.
ADAMS, J., dissents.
ADAMS, Justice (dissenting).
I dissent because in many ways this case closely parallels Progressive Specialty Insurance Co. v. Hammonds, 551 So.2d 333 (Ala.1989). Although the posture of Progressive Specialty was somewhat different from that of this case, the facts of Progressive Specialty bear a remarkable resemblance to those before us. The pertinent facts of Progressive Specialty are set forth below:
"On January 19, 1987, Hammonds's automobile, in which James Scott Fuller was a passenger, collided with a second vehicle. As a result of that accident, Fuller sustained serious injuries and subsequently died. At the time of the accident, Hammonds carried automobile liability insurance with Alfa Mutual Insurance Company (`Alfa'); Hammonds's insurance had a $25,000 coverage limit for Fuller's injuries and death. Scott Fuller was covered by the underinsured motorist provisions of two policies of automobile insurance issued by Progressive to his father, James R. Fuller.

*354 "James R. Fuller was appointed executor of his son's estate, and, in that capacity, he retained a lawyer in connection with the accident that killed his son. The lawyer, on March 5, 1987, wrote Reynolds Insurance Agency:
"`I represent James R. Fuller in connection with his claims arising out of the death of his minor son, Scott Fuller, on January 19, 1987. It is my understanding that the owner of the vehicle in which Scott was riding, the driver of which appears from the State Trooper report to have been at fault in connection with the accident, is insured by Alabama Farm Bureau Insurance Company with coverage of only $25,000.00.
"`My client has two insurance policies obtained through you in which Progressive Specialty Insurance Company of Cleveland, Ohio is the insurer. These policies provide for uninsured and underinsured motorist coverage in what appears to be total coverage of $80,000. Under these circumstances, it appears that there is the possibility of a substantial recovery against Progressive Specialty Insurance Company. I shall appreciate it if you will notify them of this claim and ask them to have someone contact me about it at an early date.'
"Progressive wrote the lawyer on March 17, 1987, stating that it had received the March 5 letter and that it was investigating the accident. The lawyer and Progressive continued a course of correspondence, with the lawyer writing Progressive on March 26, April 17, and May 21, and Progressive replying on April 6, April 24, and May 22, respectively. The lawyer repeatedly asked Progressive to make a decision either to deny or to pay the claim, and Progressive consistently replied that it was still investigating the claim, that a decision either to deny or to pay the claim would be reached `in the very near future.'
"On June 9, 1987, nearly five months after the accident, James R. Fuller, as executor of his son's estate, executed a pro tanto release, releasing Hammonds from all liability for the injuries and death of his son in exchange for $25,000, the proceeds of the Alfa liability policy. The release stated that Fuller expressly reserved his right, as executor of his son's estate, to proceed against Progressive for the underinsured motorist benefits available under the policies issued by it.
"On June 10, 1987, Fuller's lawyer wrote Progressive again, informing it that Fuller had signed a pro tanto release of Hammonds and that Alfa had paid its $25,000 policy limit. Progressive responded on June 25 by writing a letter that once again promised `to evaluate this claim in the very near future.' On June 29, Fuller filed an action against Progressive, seeking to recover the underinsured motorist benefits allegedly due him under his policies with Progressive.
"Progressive answered and filed a third-party complaint against Hammonds. Both Hammonds and Progressive filed motions for summary judgment. On June 7, 1988, the trial court entered summary judgment in favor of Hammonds on Progressive's third-party claim, stating as follows, in pertinent part:
"`... The Court finds that Progressive Specialty Insurance Company's right to subrogation is dependent ultimately upon the Third Party Defendant's liability to the Plaintiff. Since the liability of the Third Party Defendant, Ellis Monroe Hammonds, has been released by the Plaintiff the claim alleged in the Third Party Complaint is thereby lost.
"`At the time of the execution of the pro tanto release, the Plaintiff owned all the cause of action as to the tort-feasor, Ellis Monroe Hammonds, and no subrogation claim existed. By releasing the tort-feasor, Ellis Monroe Hammonds, from any and all claims, the plaintiff has effectively destroyed Progressive Specialty Insurance Company's right to subrogation from Ellis Monroe Hammonds.

*355 "`....
"`Based on the Findings of Fact stated hereinabove and the Conclusions of Law, the ... Motion of the Third Party Defendant, Ellis Monroe Hammonds, for a summary judgment... is hereby granted.
"`It is further ORDERED, ADJUDGED AND DECREED by this Court that there is no just reason for delay, and it is directed that this ... summary judgment in favor of the Third Party Defendant, Ellis Monroe Hammonds, be entered as a final judgment under the provisions of Rule 54(b), Alabama Rules of Civil Procedure.'
"....
"Progressive argues that, because it allegedly did not know that Fuller was executing the release before he executed it, the trial court erred when it held that the release executed by Fuller destroyed its subrogation rights. In both Hardy v. Progressive Insurance Co., 531 So.2d 885 (Ala.1988), and Auto-Owners Insurance Co. v. Hudson, 547 So.2d 467 (Ala. 1989), the Court has recently addressed an insurer's subrogation rights in relation to an insured's claim for underinsured motorist benefits.
"In Hardy, we reversed a summary judgment for Progressive Insurance Company on Hardy's claim for underinsured motorist benefits. Mr. Wonderful Brown's automobile struck the automobile driven by Hardy and seriously injured her. Brown's insurer, United States Fidelity and Guaranty Company, settled with Hardy. Hardy then filed an action against Progressive, alleging that at the time of the accident she had in force a policy of insurance issued by Progressive that provided underinsured motorist coverage and alleging that Brown was an underinsured motorist. The trial court granted Progressive's motion for summary judgment, and we reversed, because the record did not contain any documentation to support the trial court's judgment. In making that holding, the Court stated:
"`Some insurance companies have renounced their rights of subrogation for underinsured motorist coverage by provisions within the policies. See, i.e., Silvers v. Horace Mann Ins. Co., 90 N.C.App. 1, 367 S.E.2d 372 (1988); and Branch v. Travelers Indem. Co., 90 N.C.App. 116, 367 S.E.2d 369 (1988). When this has not been done, some courts have fashioned a procedure to release an insured victim from the twilight zone that he is placed in between underinsured coverage and an insurer's right to subrogation. Schmidt v. Clothier, 338 N.W.2d 256 (Minn.1983); Vogt v. Schroeder, 129 Wis.2d 3, 383 N.W.2d 876 (1986); Hamilton v. Farmers Ins. Co. of Washington, 107 Wash.2d 721, 733 P.2d 213 (1987).'
Hardy, supra, at 887.
"The opinion further stated:
"`In Progressive Cas. Ins. Co. v. Kraayenbrink, 370 N.W.2d 455 (Minn. Ct.App.1985), the Minnesota Court of Appeals, in holding that an insured's release of an underinsured tort-feasor did not preclude the insured from recovering underinsurance benefits for uncompensated injuries from his insurer, Progressive, despite the destruction of Progressive's subrogation rights, wrote:
"`"The general rule is that a settlement and release of an underinsured tortfeasor will not automatically preclude recovery of underinsured benefits. Schmidt v. Clothier, 338 N.W.2d 256, 262 (Minn.1983). When an insured party has given his underinsurance carrier notice of a tentative settlement prior to release, and the insurance carrier has the opportunity to protect its subrogation rights by paying the underinsurance benefits before the release, the release will not preclude recovery of underinsurance benefits. Schmidt, 338 N.W.2d at 263. If the tortfeasor is released before the insurance carrier makes payment to its insured, however, subrogation rights do not arise."
"`370 N.W.2d at 460.'
Hardy, 531 So.2d at 887-88.

*356 "In Auto-Owners Insurance Co. v. Hudson, supra, this Court created a procedure for an insured victim to deal with what Hardy described as the `twilight zone that [the insured victim] is placed in between underinsured coverage and an insurer's right to subrogation.' 531 So.2d at 887. The plaintiff in Auto-Owners, Hudson, was involved in an automobile accident with Otis Finklea, an employee of Phillips Feed Mill. Finklea's employer's insurance covered only $50,000 of damages in relation to the accident, and Hudson had suffered injuries in the amount of at least $70,000. Hudson notified his underinsured motorist insurance carrier, Auto-Owners, that he was negotiating a settlement agreement with Finklea's insurance company and that he intended to settle with Finklea for the $50,000 maximum coverage limit. Auto-Owners wrote a letter to Hudson, threatening that if Hudson signed a release of Finklea, then he would lose his right to the underinsurance coverage. Hudson, nevertheless, executed the release, which purported to reserve Hudson's claims against Auto-Owners. Hudson then filed an action for a judgment declaring that he was entitled to underinsured motorist benefits from Auto-Owners. The trial court awarded Hudson $20,000, and we affirmed the judgment. In affirming that judgment, this Court held:
"`When the tort-feasor's liability insurer has offered to pay the maximum of its liability limits, and it is undisputed that the damages exceed that amount and, further, exceed the amount of underinsured coverage available, the insured should give its underinsured motorist insurance carrier notice of this offered settlement and the underinsured motorist carrier should consent to the settlement and forgo any right of subrogation for any underinsured motorist coverage it may subsequently pay, or else pay to its insured the amount offered by the tort-feasor's insurer and preserve its right of subrogation.'
Auto-Owners, 547 So.2d at 469.
"The holding quoted above from Auto-Owners applies in this case, because the cases are similar factually; accordingly, we consider Progressive's argument in light of Auto-Owners, though Auto-Owners had not been decided at the time of the trial court' ruling. It is undisputed both that Hammonds's insurance carrier offered to pay and indeed, did pay, its maximum liability limits and that Fuller's damages exceeded that amount. It is also undisputed that Progressive did not pay any money to Fuller. What we must determine is whether Fuller gave reasonable notice to Progressive of Hammonds's offer to settle, so that when Progressive would not pay Fuller and Fuller executed the release, Progressive's subrogation rights were destroyed.

"Though Progressive argues it did not have such notice, the record is without documentation to support this argument. On the other hand, the record does provide some evidence that Progressive did have notice. The March 5 letter written by Fuller's lawyer clearly states that Hammonds was insured by Alfa for only $25,000. The course of correspondence between Fuller's lawyer and Progressive, from March 5, 1987, through June 1987, indicates that Progressive knew Fuller intended to pursue his claims. After three months of correspondence with Progressive and nearly five months after the accident, Fuller finally signed Hammonds's release. Considering this evidence and considering that the record contains no evidence that Progressive did not have notice, we hold that Progressive had reasonable notice of Fuller's intent to settle with Hammonds and that Progressive had reasonable time to respond to Fuller's actions. Progressive's only response to Fuller was to send letters that repeatedly, over several months, promised to make a decision on Fuller's claim `in the near future.' Progressive did not act reasonably in safeguarding its subrogation rights, and, because Fuller released Hammonds before Progressive acted to protect its subrogation rights, Progressive's subrogation rights *357 were destroyed. Auto-Owners, supra; Hardy, supra, at 888."
Progressive Specialty Insurance Co. v. Hammonds, 551 So.2d 333, 334-37 (Ala. 1989) (emphasis added) (footnotes omitted). This Court stated that "[t]he course of correspondence between [the insured's] lawyer and Progressive, from March 5, 1987, through June 1987, indicates that Progressive knew [the insured] intended to pursue his claims [for underinsured motorist benefits]." 551 So.2d at 337. In the present case, as in Progressive, there was a "course of correspondence" between Beavers and Allstate regarding the possibility of an underinsured benefits claim. Clearly Allstate was placed on notice that should the tort-feasor's insurance be inadequate, there would be a claim for underinsured benefits and that Beavers would pursue that claim. From April to July, Beavers's letters to Allstate more or less updated Allstate as to the status of Beavers's claim. For example, in his April 17 letter, Beavers's attorney stated:
"Please be advised that based upon Mr. Beavers' injuries, I believe this could possibly be a case of underinsured coverage. I will keep you advised as the matter progresses. If you have any questions, please call me."
Beavers's May 9 letter to Allstate said, "If it in fact develops that there is an uninsured motorist claim, I will look forward to working with you." On July 24, 1990, Beavers wrote Allstate as follows:
"We have not settled with Alfa in the Beavers matter. The medicals are very significant, and the medical treatment is ongoing. Just as soon as I can get a handle on the total medicals, I will be in touch with you. Thanks for your cooperation."
The final letter to Allstate, dated July 30, 1990, stated:
"I am enclosing for your consideration copies of the itemized bills that I have forwarded to Phillip Troha who is the insurance carrier for the tort-feasor in this case, as well as copy of my demand letter to him.
"I, of course, have no way of knowing what the limits of coverage are for Mr. Troha's insured, but I would assume that unless it is a very unusual Alfa policy this is going to be a case of underinsured motorist coverage.
"I would appreciate your reviewing these records with that thought in mind. If you have any question please call me."
Beavers's letters to Allstate indicate that, although he assumed there would be a claim for underinsured coverage, the facts and figures were not at his disposal to make that determination for certain. Nevertheless, enclosed with the July 30 letter was a copy of the demand letter to Phillip Troha of Alfa Insurance Company, the tort-feasor's insurer. That letter stated as follows:
"I am enclosing itemized medicals in the amount of $21,558.57 on Mr. Donald Beavers.
"I am also enclosing a discharge summary and a narrative report from Dr. Jeffrey Hawkins, and a narrative report from Dr. Edward C. Tyndal.
"I would appreciate your reviewing these records and you may consider this my demand for settlement on behalf of Mr. Beavers in the amount of Two Hundred Fifty Thousand Dollars ($250,000). This demand is good for a period of ten (10) days.
"I would appreciate your prompt response. I look forward to working with you, as always."
Clearly, upon receipt of a copy of the demand letter to Alfa, coupled with the other correspondence with Beavers, Allstate was put on notice that Beavers intended to pursue his claims against both Alfa and Allstate. The trial judge refused to enter a summary judgment in favor of Allstate because the judge felt that there was a jury question presented regarding whether Allstate had failed to investigate Beavers's claim within a reasonable time. The failure of Allstate to do so would have resulted in a waiver of its subrogation rights. From April to July, Allstate was aware of a possible claim, and yet Allstate relied solely on correspondence from Beavers's attorney *358 and did nothing to investigate the validity of Beavers's claim. Then, from July to December, when Beavers executed the release, Allstate did nothing whatever with regard to Beavers's claims. I conclude that such a failure to investigate, in light of the fact that Allstate was notified of a possible claim, presents a jury question as to whether Allstate acted reasonably. Therefore, I dissent.
NOTES
[1] Because this action was not pending on June 11, 1987, Ala.Code 1975, § 12-21-12, mandates that the nonmovant meet his burden by "substantial evidence." Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Under the substantial evidence test, once the movant has made a prima facie showing that there is no genuine issue of material fact and that he is entitled to a judgment as a matter of law, the nonmovant must rebut that showing by presenting "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). More simply stated, "[a]n issue is genuine if reasonable persons could disagree." Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1982).
[2] United Services Automobile Association v. Allen, 519 So.2d 506 (Ala.1988); Hardy v. Progressive Ins. Co., 531 So.2d 885 (Ala.1988); Auto-Owners Ins. Co. v. Hudson, 547 So.2d 467 (Ala. 1989); Progressive Specialty Ins. Co. v. Hammonds, 551 So.2d 333 (Ala.1989).
[3] The order of the trial court states, in part, that "prior to signing the release, notice of the proposed settlement and release was not given to Allstate." (Emphasis in original.)
[4] In his brief, counsel for Beavers argues that Beavers "communicated with Allstate on April 30, 1990 (R. 171), by letter on May 9, 1990 (R. 172), by letter on July 24, 1990 (R. 174), by letter on July 30, 1990 (R. 175), by letter on August 16, 1990 (R. 177), and by letter on December 17, 1990 (R. 178)."