740 So.2d 1053 (1999)
Dan OVERSTREET and Sally Overstreet
v.
SAFEWAY INSURANCE COMPANY OF ALABAMA.
1972291.
Supreme Court of Alabama.
June 4, 1999.
Rehearing Denied August 20, 1999.
J. Danny Hackney of Gaiser & Associates, P.C., Birmingham, for appellants.
Jack M. Bains, Jr., of McDaniel, Bains & Norris, P.C., Birmingham, for appellee.
HOUSTON, Justice.
Dan Overstreet and Sally Overstreet, husband and wife, appeal from a summary judgment for Safeway Insurance Company of Alabama ("Safeway"), in their action seeking damages for breach of a contract for uninsured/underinsured-motorist coverage and for bad-faith refusal to investigate an insurance claim. We affirm.
On January 8, 1995, Dan Overstreet, an employee of Allied Systems, Inc., was involved in a serious motor-vehicle accident wherein the tractor-trailer truck he was driving (a truck owned by Allied) collided *1054 with a motor home driven by Dale Warmann. The collision killed Warmann and left Mr. Overstreet with permanent injuries that reduced his earning capacity. Mr. Overstreet sought to recover for his injuries; in January 1996, through his attorney, Timothy Hughes, he agreed to a settlement with Allied's workers' compensation carrier. Hughes then pursued a claim against Farmers Group of Insurance Companies ("Farmers"), Warmann's automobile-liability-insurance carrier.
On May 29, 1996, Hughes sent a letter to Safeway, the Overstreets' insurer, stating, in full:
"I represent Mr. Dan P. Overstreet with respect to an automobile accident he was involved in while employed in the course and scope of his employment at Allied Systems, Inc., on the above-referenced date. We are presently pursuing the third party claim against Farmers cInsurance Group with respect to this accident. Please be advised that a policy limit demand has been made upon Farmers Insurance Group with respect to this matter. We are therefore notifying you by this correspondence of our attempt to obtain policy limits from Farmers Insurance Group in this matter. Upon review of my Client's declaration page of his insurance policy with Safeway Insurance Company, by and through All American Agency, it is apparent my Client had injury liability of Twenty/Forty Coverage with respect to his uninsured/underinsured coverage. My review of this policy indicates that this policy was in effect at the time my Client was involved in this automobile accident. My Client, Dan Overstreet, had properly paid premiums for this policy and we would therefore seek to confirm this policy was in effect and applicable coverages for this accident should there be an uninsured/underinsured claim in excess of the liability limits of the tort feasor. Therefore, please copy my office with a certified copy of the policy and/or declaration page. We will therefore keep you apprised of the policy limit demand in this case.

"Please do not hesitate to contact my office if you have any further questions or concerns. I am diarying my file for ten (10) days in anticipation of your response hereto."
(Emphasis added.)
Hughes followed up this letter with a June 6, 1996, telephone conversation with Alison Duke, one of Safeway's claims adjusters. During the conversation, Hughes informed Ms. Duke of the workers' compensation settlement and of the Overstreets' pending claims against Farmers.
On August 13, 1996, Hughes sent Ms. Duke another letter, which read in full:
"I am writing this letter as follow-up pursuant to my correspondence dated May 29, 1996, a copy of which is enclosed herewith. As this previous correspondence indicates, we have put Safeway Insurance Company of Alabama, Inc., on notice with respect to my Client's Claim with respect to the above-referenced matter. We are presently pursuing the third party claim against Farmers Insurance Group with regard to the accident involving my Client, Dan P. Overstreet. A policy limit demand has been made upon Farmers Insurance Group. It is apparent that the coverage limits with respect to Farmers Insurance Group will not be sufficient to make my Client whole with regard to recovery in this case.
"My Client has suffered permanent disability with respect to his injuries in this matter, as well as the loss of his previous employment at Allied Systems, Inc. Dr. Richard E. Meyer has opined that Mr. Overstreet has suffered a Five Percent (5%) Partial Impairment Rating to his Upper Extremity which equates to a Ten Percent (10%) Vocational Disability Rating. This resulting disability has limited my Client's work performance levels and he has suffered a wage loss and a job loss as result of the incident made the basis of this claim.

*1055 "Further, additional surgery may be required to be performed on my Client resulting from this accident. Additionally, we have verified Mr. Overstreet's income for the years previous to this accident. In comparison with my Client's previous income to his present earning wages, my Client is earning approximately $19,571.10 less at his present job. According to annuity tables, based upon my Client's remaining work life expectancy, his future earning[s] would be in the approximate amount of $300,183.27 based upon the present value of his future earnings. However, according to the previous wages of my Client, the present value of his future wages would have been in the amount of $540,974.34. The present value loss, according to the difference in the amounts of present value earnings/losses, would equal a present value loss of $240,791.07. Please note that this amount of present value wage loss does not include any assessments for mental anguish or pain and suffering.
"It is apparent therefore that my Client's losses are substantial and in excess of the applicable policy limits of Farmers Insurance Group in this matter. We would therefore contend that my Client would not be made whole upon recovery and exhaustion of Farmers Insurance Group's policy limits. We therefore would, at this time, make a demand for $750,000.00 or policy limits in effect with respect to any and all applicable coverages, policies, umbrella policies or coverages for this accident within thirty (30) days from the date of this demand. Additionally, please provide a copy of the policy and/or the declaration page verifying coverages.
"It is apparent that my Client has suffered and will continue to suffer great pain and discomfort on account of the injuries which occurred as a result of the accident referenced hereinabove. We would therefore seek to resolve this matter in the amount of the above stated demand or policy limits with respect to applicable coverages in this matter as requested herein. My review of the above-referenced policy indicates that this policy was in effect at the time my Client was involved in this automobile accident. My Client, Dan Overstreet has properly paid premiums for this policy and we would therefore seek to recover the policy limits and applicable coverages on this policy for this accident since it is apparent there is an uninsured/underinsured claim in excess of the liability limits of the tort feasor.
"Therefore, please contact me immediately upon receipt of this letter in order that we may discuss this matter further. Enclosed, please find the statement of my Client, Dan P. Overstreet with respect to the claim form which you forwarded to my office. Thank you for your attention and cooperation in this matter."
Even though the letter of August 13 did not revoke the statement "[w]e will ... keep you apprised of the policy limit demand," appearing in the letter of May 29, Ms. Duke, on September 6, 1996, as requested in the August 13 letter, telephoned Hughes's office, and, upon learning that Hughes was not available, left a message asking for Hughes to call her back during the week of September 16. Hughes claims that he called her back on September 16, but that she was not in and that he received no response or return call.
On September 11, 1996, the Overstreets, upon advice of Hughes, accepted a settlement with Farmers for $50,000, an amount that represented the limits of the Farmers liability policy. On September 17, Mr. Overstreet executed a full and final release with respect to Farmers and Warmann's estate. Safeway was not notified of the settlement until November 7, 1996.
The policy issued by Safeway to the Overstreets provided, in pertinent part:
"[Safeway] do[es] not provide Uninsured[1] *1056 Motorist Coverage for bodily injury sustained by any person:
"1. If that person or the legal representative settles the bodily injury claim without our consent."
Safeway denied coverage under the Overstreets' underinsured-motorist policy because Mr. Overstreet had settled with Farmers and Warmann's estate without Safeway's consent. The Overstreets filed this action in the Jefferson County Circuit Court against Safeway and others, alleging breach of contract and bad-faith failure to investigate a claim. The trial court granted Safeway's summary-judgment motion, and this appeal followed.
Under our standard of review applicable to summary judgments, we must determine whether there was a genuine issue of material fact and, if not, whether the movant was entitled to a judgment as a matter of law. Rule 56, Ala. R. Civ. P. In doing so, we must review the record in the light most favorable to the nonmovant. McClendon v. Mountain Top Indoor Flea Mkt., Inc., 601 So.2d 957, 958 (Ala.1992).
In Lambert v. State Farm Mut. Auto. Ins. Co., 576 So.2d 160 (Ala.1991), this Court listed certain guidelines that are to be followed by the parties involved in uninsured/underinsured-motorist claims such as the one before us. With regard to the procedure of giving "notice" to an underinsured-motorist carrier, we stated:
"(1) The insured, or the insured's counsel, should give notice to the underinsured motorist insurance carrier of the claim under the policy for underinsurance benefits as soon as it appears that the insured's damages may exceed the tortfeasor's limits of liability coverage.
"(2) If the tort-feasor's liability insurance carrier and the insured enter into negotiations that ultimately lead to a proposed compromise or settlement of the insured's claim against the tort-feasor, and if the settlement would release the tort-feasor from all liability, then the insured, before agreeing to the settlement, should immediately notify the underinsured motorist insurance carrier of the proposed settlement and the terms of any proposed release.

"(3) At the time the insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle, the insured should also inform the carrier as to whether the insured will seek underinsured motorist benefits in addition to the benefits payable under the settlement proposal, so that the carrier can determine whether it will refuse to consent to the settlement, will waive its right of subrogation against the tortfeasor, or will deny any obligation to pay underinsured motorist benefits. If the insured gives the underinsured motorist insurance carrier notice of the claim for underinsured motorist benefits, as may be provided for in the policy, the carrier should immediately begin investigating the claim, should conclude such investigation within a reasonable time, and should notify its insured of the action it proposes with regard to the claim for underinsured motorist benefits.
"(4) The insured should not settle with the tort-feasor without first allowing the underinsured motorist insurance carrier a reasonable time within which to investigate the insured's claim and to notify its insured of its proposed action."
576 So.2d at 167. (Emphasis added.) This Court made it clear that these guidelines were tailored to protect the interests of the underinsured-motorist carrier:

*1057 "These general guidelines should be applied with the understanding that the purpose of consent-to-settle clauses in the uninsured/underinsured motorist insurance context is to protect the underinsured motorist insurance carrier's subrogation rights against the tort-feasor, as well as to protect the carrier against the possibility of collusion between its insured and the tort-feasor's liability insurer at the carrier's expense."
Id.
It is true, as the appellants point out, that the Lambert guidelines must "take into consideration the facts and circumstances of each individual case." Id. However, the facts of this case are quite similar to those in Allstate Ins. Co. v. Beavers, 611 So.2d 348 (Ala.1992). In that case, Beavers, who had an insurance policy with Allstate Insurance Company, was injured in an automobile accident involving two individuals who were insured by Alfa Insurance Company. Beavers, 611 So.2d at 349. The events subsequent to the accident were as follows:
"Beavers's attorney notified Allstate on April 17, 1990, of the accident and that it `could possibly be a case of uninsured coverage.' On May 1, 1990, Allstate wrote to Beavers's attorney, requesting that he send Beavers's medical records. In the letter, Allstate also notified the attorney that it had subrogation rights under the policy and requested that the attorney notify Allstate before Beavers signed a release.
"On May 9, 1990, Beavers's attorney wrote to a senior staff claim representative for Allstate, stating that `if it in fact develops that there is an uninsured motorist claim, I will look forward to working with you.' On July 16, 1990, an agent of Allstate wrote to the attorney and asked for the status of the underinsured motorist claim. On July 24, 1990, the attorney wrote Allstate, stating that he had not settled with the tort-feasor's carrier, Alfa, and that as soon as he had `a handle' on the total medical bills, he would contact Allstate again. On July 30, 1990, Beavers's attorney wrote Allstate again, enclosing a copy of Beavers's medical bills and a copy of the demand letter to an Alfa adjuster.
"Between July 30, 1990, and December 12, 1990, there was no communication between Allstate and Beavers or his attorney. Allstate received no information and made no investigation concerning the status of Beavers's possible underinsured motorist claim or the status of Beavers's claim against the tort-feasor. On December 13, 1990, Beavers settled his claim with the tort-feasor, accepted a settlement check, and executed a full and final release. On that same day, Beavers's attorney contacted Allstate by telephone and notified it that Alfa had paid its limits and that he wanted to conclude the case by year's end. Allstate requested evidence of Alfa's policy limits, evidence that Alfa had tendered those limits, and a list of medical expenses Beavers was claiming as a result of the accident. Beavers's attorney agreed to provide all of the requested information. On December 18, 1990, Allstate wrote Beavers's attorney and again asked for the information that had been requested by telephone on December 13, 1990. On January 7, 1991, without providing any of the information requested by Allstate on December 13 and December 18, 1990, Beavers's attorney wrote Allstate, demanding the policy limits of Beavers's underinsured motorist coverage.
"On January 9, 1991, Allstate contacted Alfa and learned that a release had already been executed. Allstate requested a copy of the release from Alfa. On January 11, 1991, Allstate wrote Beavers's attorney to inform him that it had learned that a release had been executed and to ask for a copy of the release so that it could determine how to proceed. On January 18, 1991, Alfa sent Allstate, via telecopier, a copy of the *1058 release that Beavers had executed on December 13, 1990."
611 So.2d at 349-50. In reversing the order of the trial court denying Allstate's motion for a summary judgment on Beavers's claims, we rejected the argument that general communications about a claim without a specific notice of the existence of a settlement was sufficient under Lambert:
"Beavers's argument, insofar as that argument is made in support of his action against Allstate alleging fraud and bad faith failure to pay, has no merit. The facts in this record show, as a matter of law, that Allstate was not guilty of fraud or of a bad faith failure to pay the claim.
"Beavers's argument, as it relates to his contract claim, however, is more persuasive, but his argument, insofar as it relates to that claim, seems to ignore the procedural requirement of Lambert that it is the notice of the proposed settlement that legally, and logically, requires action within a reasonable time by the underinsured motorist insurance carrier. Although the record shows that Beavers's attorney and Allstate corresponded about the claim, it is undisputed that neither Beavers nor his attorney notified Allstate before he executed the release.

". . . .
"Applying these guidelines to the facts of this case, [we reach this question]: Did Beavers or his attorney give sufficient notice to Allstate of the proposed settlement? We think not. It is undisputed that Allstate had no knowledge of the proposed settlement or of the terms of the settlement.
"Beavers's argument is that he gave Allstate notice, as required by Lambert, by letter and by telephone, and that Allstate's duty to investigate was triggered as early as April 17, 1990, when his attorney notified Allstate of the possibility of a claim under the policy. As this Court said in Brantley v. State Farm Mutual Auto. Ins. Co., 586 So.2d 184 (Ala.1991), `[w]e are mindful of the fact that each case presents different facts and circumstances and must be treated accordingly'; we, nevertheless, held in that case that the summary judgment was appropriate under the facts of that case. In Brantley, of course, there was no notice given to State Farm by Brantley of his intent to file a claim until after he had settled with the tort-feasor and had executed a release. Here, there was notice given to Allstate that a claim might be made under the policy. The question, of course, is whether, based on the particular facts and circumstances of this case, Allstate was put on notice, under the Lambert guidelines, that a claim for underinsured motorist insurance benefits would be made, or on notice of its insured's intent to settle with the tort-feasor and the tort-feasor's carrier? We think not. As this Court stated in Brantley, each case must be decided on its particular facts and circumstances.
"The real question presented is whether the facts and circumstances in this case show, as a matter of law, that the insured waived his right to uninsured motorist insurance benefits by settling with the tort-feasor and the tort-feasor's carrier without notifying Allstate of his intent to settle and to file a claim against Allstate under its policy.
"Based on the facts and circumstances before us, we hold that the trial court improperly denied Allstate's motion for summary judgment as to each of Beavers's claims. Lambert clearly requires that, before Beavers made any final settlement, he must have given Allstate reasonable notice of his intent to file a claim for underinsured motorist insurance benefits. Brantley, 586 So.2d at 187-88. Beavers settled with Alfa and did release Alfa's insured from all liability. Before doing this, Beavers did not provide Allstate with adequate notice of the proposed settlement and of the terms of the release, as required by *1059 the Lambert guidelines, for Allstate to adequately protect its subrogation rights. Consequently, Allstate never had the opportunity to consent to, or to refuse to consent to, the settlement agreement entered into by Beavers. Id."
611 So.2d at 352-53. (Emphasis added.)
This case is like Beavers, in that it seems clear from the record in this case that although there was correspondence between Safeway and Mr. Hughes concerning the existence of a claim; concerning the fact that the Overstreets were pursuing a claim against Warmann's insurance carrier; and concerning the fact that a demand was being made on Safeway, there was no correspondence of any kind that communicated the specifics of the Overstreets' proposed settlement or the fact that a settlement had even been reached, even though Hughes had promised to keep Safeway "apprised of the policy limit demand." Even viewing the evidence in the light most favorable to the Overstreets, we must conclude that the notice required under Lambert was not present.
Because notice of the settlement was not given to Safeway, the summary judgment was proper with respect to the Overstreets' claim alleging a bad-faith failure to investigate. As we said in Beavers:
"Under the guidelines set forth in Lambert, it is the insured's notice to the carrier of his intention to seek underinsured motorist insurance benefits `[a]t the time insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle' that requires the carrier to investigate the claim in order to determine whether to protect its subrogation rights. 576 So.2d at 167. See also Jones v. Allstate Ins. Co., 601 So.2d 989 (Ala.1992); Brantley v. State Farm Mutual Auto. Ins. Co., 586 So.2d 184 (Ala.1991)."
Beavers, 611 So.2d at 352. (Emphasis added.)
Citing Thompson v. American States Ins. Co., 687 F.Supp. 559 (M.D.Ala. 1988), and cases from states other than Alabama, the Overstreets contend that Safeway had to show that it was prejudiced by the settlement before it could be entitled to a summary judgment on the contract claim. This court, in State Farm Mut. Auto. Ins. Co. v. Burgess, 474 So.2d 634, 637 (Ala.1985), addressed whether prejudice to the insured should be a consideration in uninsured-motorist cases:
"We now hold that in uninsured motorist insurance cases, unlike liability insurance cases, prejudice to the insurer is a factor to be considered, along with the reasons for delay and the length of delay, in determining the overall reasonableness of a delay in giving notice of an accident. In the typical case, the insured must, at a minimum, put on evidence showing the reason for not complying with the insured's notice requirement. This prerequisite satisfied, the insurer may then demonstrate that it was prejudiced by the insured's failure to give timely notice. If the insurer fails to present evidence as to prejudice, then the insured's failure to give notice will not be a bar to his recovery."
See, also, Midwest Employers Cas. Co. v. East Alabama Health Care, 695 So.2d 1169 (Ala.1997).
The record contains no reasonable explanation for the Overstreets' failure to properly notify Safeway of the settlement. Furthermore, Robert P. Wise, vice president of claims for Safeway, testified by affidavit:
"I would have considered advancing Farmers policy limits and protecting [Safeway's] right to subrogation in this cause. That ultimate decision would have been mine. However, because neither Alison Duke nor myself were ever made aware of the pending settlement with Farmers and never had the opportunity to consent to or even consider that settlement this opportunity was never given Safeway."
*1060 Clearly, this is evidence that Safeway was prejudiced.
The Overstreets argue that Safeway was not prejudiced, for the following two reasons: First, the Overstreets argue, Warmann was a resident of Missouri and any claim against his estate would be barred by Missouri Code, Title XXXI, Chapter 473.360 ("Limitations on filing claims when claims barred"). The Overstreets maintain that the six months allowed by this statute of nonclaims had expired before the Overstreets settled with Farmers. However, the statute provides that claims must be filed "within six months after the date of the first published notice of letters testamentary or of administration." Mo. Ann. Stat. § 473.360. No evidence in the record before us indicates that any notice of letters testamentary or of administration has been published. In Hughes's affidavit, he states: "I even went so far as to inquire into the Probate Court in the county of St. Louis, Missouri where Mr. Warman [sic] lived to determine if any estate had been probated...." Hughes does not state whether Mr. Warmann's estate had been probated. Only Warmann, not his executor, administrator, or estate, was named in the release signed by Mr. Overstreet on September 17, 1996.
Second, the Overstreets argue that there is no prejudice to Safeway because, they say, Warmann's estate was insolvent. Hughes states in his affidavit: "I even went so far as to inquire into the Probate Court in the county of St. Louis, Missouri where Mr. Warman [sic] lived to determine... if there were any other assets to be obtained other than the $50,000.00 insurance policy." Hughes does not state that there were no other assets. Mr. Overstreet testified that at the time of the accident Warmann was driving a "big motor home," "a Winnebago-type motor home," which the Overstreets alleged Warmann owned. This is not evidence that Warmann was insolvent.
Based on our examination of the record, we conclude that there is no evidence tending to show that the Overstreets' failure to obtain Safeway's consent to the settlement and the release was reasonable under the circumstances. Likewise, there is no evidence tending to refute Wise's testimony that Safeway was prejudiced by the Overstreets' failure to notify Safeway before they settled with Farmers. Therefore, the trial court properly entered the summary judgment for Safeway.
AFFIRMED.
HOOPER, C.J., and MADDOX and COOK, JJ., concur.
SEE and BROWN, JJ., concur in the result.
LYONS, J., concurs in the rationale in part, dissents from the rationale in part, and concurs in the result.
KENNEDY and JOHNSTONE, JJ., dissent.
LYONS, Justice (concurring in the rationale in part, dissenting from the rationale in part, and concurring in the result).
I concur in the result of the main opinion, but I write specially to address several issues. First, I see a noteworthy difference between this case and Lambert v. State Farm Mut. Auto. Ins. Co., 576 So.2d 160 (Ala.1991). In Lambert, this Court addressed the problem of releasing "the insured from the `twilight zone' that he is placed in when the underinsured [or uninsured] motorist insurance carrier does not want to give its consent to settle, or wants to protect its subrogation rights." 576 So.2d at 165. That statement of the problem assumes the existence of an adversarial relationship between the insured and the uninsured motorist carrier after the insured has unsuccessfully attempted to secure the required consent to the settlement called for in the policy language. No such relationship is present here, because the insured never gave the underinsured-motorist *1061 carrier the opportunity to grant or to withhold its consent.
Second, I concur with the main opinion's holding that the guidelines established in Lambert and Allstate Ins. Co. v. Beavers, 611 So.2d 348 (Ala.1992), require us to find that the Overstreets did not provide Safeway with adequate notice of the proposed settlement. I realize that, as the Overstreets argue, this case is different from Beavers. In Beavers, the insured's attorney informed the insurer only that a claim might be made for underinsured-motorist benefits. 611 So.2d at 349, 353. In the present case, however, the Overstreets' attorney demanded uninsured-motorist benefits under the policy. The Overstreets' expert testified that, in his opinion, this demand was "sufficient to place Safeway on notice that a settlement with the tort-feasor's insurance carrier was pending." (C.R.446-47.)
I find this to be a distinction without a difference. Under Lambert and Beavers, the insured is required to give the insurer notice of the proposed settlement and the terms of the proposed release. Lambert, 576 So.2d at 167; Beavers, 611 So.2d at 353. It is this notice that allows the insurer to protect its subrogation rights. Id. The demand made by the Overstreets' attorney for uninsured-motorist benefits did not give notice of a proposed settlement, much less notice of the terms of a proposed release. Without the required notice, Safeway could not adequately protect its subrogation rights, and the main opinion correctly concludes that the Overstreets did not provide Safeway with adequate notice.
As the main opinion correctly recognizes, however, our analysis does not end with a finding of inadequate notice. Under State Farm Mut. Auto. Ins. Co. v. Burgess, 474 So.2d 634, 637 (Ala.1985), an insured's failure to give adequate notice may be excused. In Burgess, 474 So.2d at 637, this Court established guidelines by which an insured could qualify for such an excuse:
"In the typical case, the insured must, at a minimum, put on evidence showing the reason for not complying with the [insurer's] notice requirement. This prerequisite satisfied, the insurer may then demonstrate that it was prejudiced by the insured's failure to give timely notice. If the insurer fails to present evidence as to prejudice, then the insured's failure to give notice will not be a bar to his recovery. When the insurer puts on evidence of prejudice, however, the reasonableness of the failure to give notice becomes a question of fact for the jury to decide."
I agree with the main opinion that the Overstreets did not meet their initial burden of presenting evidence showing why they did not comply with Safeway's notice requirement. In Burgess, the insured presented evidence indicating that he did not give notice to his insurer because he did not know that the tortfeasor was uninsured. 474 So.2d at 636-37. This Court accepted that explanation. Id. Here, however, the Overstreets gave no explanation for their failure to give notice to Safeway. The record shows that the Overstreets presented expert testimony indicating that the demand for underinsured-motorist benefits provided sufficient notice of a settlement; however, as noted above, that evidence is insufficient under Lambert and Burgess.
Third, under Burgess, our analysis should end with a finding of a lack of an explanation, as such a finding would bar the Overstreets from recovering under their policy. See Burgess, 474 So.2d at 637. The main opinion, however, unnecessarily addresses the issue of prejudice; to the extent it does so, I dissent from its rationale.
The main opinion concludes that Safeway has shown that it was prejudiced, but all the insurer has shown is that it was deprived of the opportunity to make an investigation. That circumstance will occur in every case where the insurer has *1062 the burden of showing prejudice. Unless the insurer can show that a timely investigation would have revealed that the tort-feasor had assets that were placed beyond reach by reason of the settlement and release, I would hold that the insurer has not carried its burden of showing prejudice.
The main opinion's statement that "there is no evidence tending to refute [the testimony of Robert P. Wise, vice president of claims for Safeway] that Safeway was prejudiced by the Overstreets' failure to notify Safeway before they settled with [the tort-feasor's insurance carrier]," 740 So.2d at 1060, is not supported by Burgess. Under Burgess, supra, the insured has no burden of refuting evidence of prejudice offered by the insurer when the reasonableness of the insured's failure to give notice is at issue. If the insurer's conduct justified the insured's failure to give notice, then the insurer would profit from its own wrongdoing if it could thereafter defeat the insured's recovery by making a showing of prejudice. When the insured provides a reasonable explanation for not complying with the insurer's notice provision, any showing of prejudice by the insurer creates a question of fact as to the reasonableness of the insured's failure to give notice. Burgess, 474 So.2d at 637. The main opinion's statement implies that the insurer's showing of prejudice, at a level below what I consider sufficient to sustain its burden, coupled with a lack of evidence from the insured that refutes the insurer's showing, requires the trial court to enter a judgment as a matter of law in favor of the insurer even when the insured has shown a reasonable excuse for not giving notice.
Nonetheless, I concur in the result because the Overstreets did not carry their initial burden of presenting evidence to establish a reasonable explanation for their failure to comply with Safeway's notice provision.
JOHNSTONE, Justice (dissenting).
I respectfully dissent from the affirmance of the summary judgment granted by the trial court in favor of defendant Safeway and against the plaintiff, who is suing for underinsured-motorist benefits. The plaintiff timely notified his insurer, Safeway, of the motor vehicle collision, of his claim against the adverse driver, and of the plaintiffs underinsured-motorist claim against Safeway itself. While the plaintiff did conclude a settlement with the adverse driver and release him without notice to or agreement with Safeway, Safeway has failed to prove by substantial evidence that the settlement or lack of notice prejudiced Safeway. Specifically, it has not proved that, but for the settlement or lack of notice, Safeway could have recovered one penny more from the adverse driver than did the plaintiff and thus that Safeway could have reduced its liability to the plaintiff by more than did the settlement.
Proof of such prejudice is necessary for Safeway to avoid its liability to its own insured on the underinsured-motorist coverage of the policy. Thompson v. American States Ins. Co., 687 F.Supp. 559 (M.D.Ala.1988). While the main opinion cites State Farm Mutual Auto. Ins. Co. v. Burgess, 474 So.2d 634 (Ala.1985), for the proposition that the insured must prove a reasonable explanation for the lack of notice before the insurer is put to its proof of prejudice, Burgess addresses only the ramifications of an insured's failing to give timely notice of the accident itself. In the case now on appeal, the insurer received timely notice of the accident and the underinsured-motorist claim and had over three months in which to investigate before the settlement occurred.
The only material in the record purporting to constitute evidence of prejudice does not. First, the affidavit of Safeway vice president Robert P. Wise states, in pertinent part, only:
"I would have considered advancing Farmer's policy limits and protecting our [Safeway's] right to subrogation in *1063 this cause. That ultimate decision would have been mine. However, because neither Alison Duke nor myself were ever made aware of the pending settlement with Farmer's and never had the opportunity to consent to or even consider that settlement this opportunity was never given Safeway."
This testimony does not in any way show that Safeway could have improved on the sum obtained by the plaintiff in the settlement. Second, the evidence that the adverse driver was driving a "big motor home," "a Winnebago-type motor home," does not prove that he owned any equity in it or that he owned any assets at all.
For aught that appears in the record, the plaintiff obtained in settlement all the deceased adverse driver could possibly supply, the policy limits paid by his liability carrier, and Safeway could have obtained no more. Thus Safeway is not entitled to the summary judgment granted by the trial court or the affirmance issued by the majority here.
NOTES
[1] "`Uninsured motor vehicle' means a land motor vehicle or trailer of any type:

"1. To which no bodily injury liability bond or policy applies at the time of the accident.
"2. To which a bodily injury liability bond or policy applies at the time of the accident but the sum of the limits of the liability coverage under all policies is less than the damages which the injured person is legally entitled to recover."
(Emphasis added.)